**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DANNI SUTANA,

       Plaintiff,                             No. 1:13-cv-00210 JCH/RHS

vs.

STATE OF NEW MEXICO, ECONOMIC DEVELOPMENT DEPARTMENT;
JONATHAN ("JON") BARELA, individually and in his official capacity;
BARBARA G. BRAZIL, individually and in her official capacity;
WADE JACKSON, individually and in his official capacity;

       Defendants.

### PLAINTIFF'S FOURTH AMENDED COMPLAINT

NOW COMES the Plaintiff, DANNI SUTANA [hereinafter "Sutana"], by and through her attorney, Law Offices of Michael E. Mozes, P.C., and hereby submits her Fourth Amended Complaint. As grounds therefor, Sutana states as follows:

### I. JURISDICTION

1.     Plaintiff Sutana is an individual that has resided at 6600 Sahchu Street, Cochiti Lake, County of Sandoval, State of New Mexico at all relevant times to this Complaint.

2.     All the facts and circumstances set forth in Sutana's Complaint occurred within the City of Santa Fe, County of Santa Fe, State of New Mexico.

3.     Defendant, New Mexico Economic Development Department [hereinafter "NMEDD"] is, a duly organized governmental department of the State of New Mexico, constituted in accordance with the laws, statutes and regulations of the State of New Mexico. EDD is amendable to suit as a governmental entity under the federal and state statutes which Sutana relies upon in bringing this lawsuit.

4.      Defendant, Jonathan Barela ("Barela"), is, based upon information and belief, a resident of the City of Albuquerque, County of Bernalillo, State of New Mexico.  Defendant Barela is sued in his individual ands official capacity.

5.      Defendant, Barbara G. Brazil ("Brazil"), is, based upon information and belief, a resident of the, City of Albuquerque, County of Bernalillo, State of New Mexico. Defendant Brazil is sued individually and in her official capacity.

6.      Defendant, Wade Jackson ("Jackson"), is, based upon information and belief, a resident of the City of Albuquerque, County of Bernalillo, State of New Mexico.  Defendant Jackson is sued individually and in his official capacity.

7.      On June 15, 2012, Sutana filed a Charge of Discrimination with the Equal Opportunity Commission ("EEOC"), alleging that she had been discriminated against by the EDD because of her disability, "Bi-Polar and Hearing Loss". [Agency Charge No. 543-2012-01154].

8.      In March 2012, A. Kurt Saenz (hereinafter "Saenz"), Administrative Services Division Director ("ASDD") provided Sutana with a spreadsheet from the Legislative Finance Committee ("LFC") and requested that Sutana investigate the New Mexico Investment Tax Credit ("NMITC") program which was the subject of the data on the spreadsheet.

9.      When Sutana could not locate financial information or data on the NMITC on the SHARE system she asked Brent Eastwood about the spreadsheet and program.  Brent Eastwood provided Sutana with a copy of the Whistle Blower's Act and requested that both she and Saenz sign it.

10.     Sutana then reported her findings or lack of ability to find financial data on the SHARE system to Saenz.

11.     In the latter part of June or early part of July 2012, Sutana notified the Attorney General's Office about the NMITC issue and about certain procurement code violations that occurred in EDD.

12.     Defendant, Barela and Defendant, Brazil, became aware that Brent Eastwood had both Sutana and Saenz sign copies of the Whistle Blower Act shortly after they (Sutana and Saenz) had signed them.

13.     Within a relatively short period of time following the signing of the Whistle Blower Act, Brent Eastwood, Kurt Saenz and Sutana were terminated form the employee of the State of New Mexico.

14.     On July 25, 2012, Sutana filed an Amended Charge of retaliation and hostile work environment by the EDD since her filing of a charge of discrimination.

15.     On September 12, 2012, Sutana filed a second Charge of Discrimination with the EEOC alleging that she had been discriminated against by the EDD because of her "Race/National Origin". [Agency Charge No. 543-2012-01425].

16.     On October 4, 2012, the EEOC issued Sutana a Notice of Right to Sue ("NRTS") stating that the EEOC was unable to conclude whether violations of the Americans with Disability Act ("ADA") had occurred.   On October 16, 2012, the New Mexico Human Rights Division issued an Order of Non-Determination for EEOC Case No. 543-2012-01154.

17.     On October 26, 2012, Sutana filed an Amended Charge of retaliation related to her wrongful termination on October 5, 2012.

18.     On November 30, 2012, the EEOC issued Sutana a Notice of Right to Sue ("NRTS") stating that the EEOC was unable to conclude whether violations of the Americans with Disability Act ("ADA") had occurred.

19.     Sutana has exhausted her administrative remedied with respect to her ADA and New Mexico Human Rights Act ("NMHRA"), N.M.S.A. 1978, § 28-1-7 claims set forth herein and has complied with all conditions precedent to maintaining this action.

20.     This Complaint is filed within 90 days of Sutana's receipt of the NRTS and Order of non-determination.

21.     This Court has subject matter jurisdiction over Sutana's state and federal claims and personal jurisdiction over the parties.

22.     Venue is proper in this Court as to the facts and circumstances as well as the location of the Defendant employer all are in the County of Santa Fe, City of Santa Fe.

23.     There is nothing in Sutana's claims under federal law that divests this Court of federal question jurisdiction, 28 U.S.C. § 1331.

## II.  FACTUAL ALLEGATIONS

24.     Plaintiff hereby adopts and incorporates by reference paragraphs 1 through 23 as set forth above.

25.     In March 2011, Sutana was advised by Defendants, Barela, Brazil and Jackson, that the EDD budget, which she would be responsible for as the Finance Manager, was $6.8 million dollars.

26.     When Sutana began her employment with EDD as a Finance Manager she was required to work longer hours than expected because the actual budget was $148.3 million, which was 95% more than she was advised.

27.     On June 20, 2011, Sutana wrote to Defendant Brazil and advised her that "I have maxed out of my comp time allowed a month ago.  I've attempted to flex my schedule but I end up working from home. I have been writing off 6-10 hours per week for the past month."  This

practice of writing off hours because Sutana was working at home continued throughout 2011. In a prior e-mail which was Carbon Copied to Defendants Brazil and Jackson, Sutana advised of a problem with the Spaceport's $22,791,897.61 budget and that she was working on cleaning up the books and "there is nobody else trained to do this … but me" (Sutana).

28.    As a direct result of the size of the actual budget ($148.3 million), Sutana had to work long hours beyond the normal work day hours. Between May and June 2011, Sutana had earned 72.5 hours of compensation time. By September 2, 2011, Sutana had earned 152.5 hours of compensation time. Due to a lack of approval of some of the compensation time, Sutana lost 72.5 hours of compensation time as of September 2, 2011. Sutana continued to lose hours of compensation time due to the excessive workload and forfeited at least 114 hours of comp time on December 31, 2011.

29.    In April, 2011, shortly after she started working at the EDD, Sutana advised Saenz, ASDD, that she had a significant hearing loss and suffered from a Bi-Polar disorder. Upon information and belief, Saenz, ASDD, shared Sutana's conditions with Defendants Brazil and Jackson.

30.    On September 2, 2011, Sutana sent an e-mail to her immediate supervisor, Saenz, ASDD and Defendants, Barela, Brazil, Jackson. In Sutana's September 2, 2011, e-mail she voiced her concerns about the following:

> (1)  being in the position for 5 months and no defined roles and responsibilities;
>
> (2)  budget going from $6.8 to $148.3 million (95% increase);
>
> (3)  outline the position she accepted and the one that she was actually working;
>
> (4)  she had worked enough time to earn 252.75 hours of comp time, 72.5 of which she lost.
>
> (5)  Ms. Sutana stated that being in an undefined position that it allows for mistreatment, incorrect expectations all of which she had been experiencing

since she became employed with EDD. Ms. Sutana explained the difficult position that she has been placed in and which resulted in her being viewed by outside agencies as "a hinder".

(6)  Ms. Sutana requested "Alternative Dispute Resolution" concerning the issues raised in her e-mail.

31.     In September, Sutana advised Saenz, ASDD, that she had received information from Dolores Gonzales that Defendant Jackson was having an extra marital affair with another ASDD employee. Ms. Sutana reported the information to her immediate supervisor, Saenz, ASDD.  In turn, Saenz, ASDD, reported the information to the Defendant Jackson and disclosed the source of the information coming from Sutana.

32.     On September 19, 2011, Defendant Jackson responded to Ms. Sutana's e-mail and rather than address the issues in the e-mail, Mr. Jackson advises Sutana that her e-mail was to be treated as a "Formal Complaint".  Mr. Jackson closed with advising Ms. Sutana that EDD would issue a "Response" to her Complaint.

33.     Upon information and belief, Defendants Brazil and Jackson began to target Sutana because of her disclosed medical conditions and her knowledge of the affair that Defendant Jackson was involved in.

34.     On September 20, 2011, Defendant Jackson provided Saenz, ASDD, with NMEDD's Response to Ms. Sutana's e-mail.  NMEDD's Response lists Saenz, ASDD, as the author and Defendant Jackson. However, Saenz, ASDD, never was questioned nor did he participate in drafting NMEDD's Response and he never authorized his name to be associated with NMEDD's Response which Defendant Jackson handed to him.

35.     Saenz, ASDD, advised Defendants Barela, Brazil and Jackson that NMEDD's Response was "factually inaccurate and contains information that has simply been fabricated."

Saenz, ASDD, further advised Defendants Barela, Brazil and Jackson, that the Response was the type of document that could get NMEDD into trouble.

36.     The State Personal Rules and Regulations, NMCA 1.7.6.13 provide for Alternative Dispute Resolution ("ADR") for matters such as those raised in Sutana's September 2, 2011, e-mail. However, Defendant Jackson's Response intentionally disregarded the provisions of the State Personnel Rules and Regulations and is nothing more than an attack on Sutana.

37.     In September 2011, Saenz, ASDD, received approval from Defendant Barela to handle Sutana's September 2, 2011 e-mail informally and to schedule a meeting with Sutana, himself and Defendants Brazil and Jackson.  Saenz, ASDD, received the approval of  Defendant Barela to not make NMEDD's Response a part of Sutana's employee file.

38.     At the meeting between Sutana, Saenz, ASDD, and Defendants Brazil and Jackson, it was presented to Sutana that the meeting was to close some issues and that Sutana's e-mail was "not a formal complaint".  However, other than minimizing Sutana's concerns the Defendants refused to address any of the real issues set forth in Sutana's September 2, 2011 e-mail.

39.     After the meeting between Sutana, Saenz, ASDD, and the Defendants, Brazil and Jackson, Saenz, ASDD, received notice from Sutana that the Defendant Jackson had placed EDD's Response in Sutana's employee file. Upon information and belief, Defendants Brazil and Jackson both participated in creating EDD's Response and both agreed to the inclusion of the Response in Sutana's employment file.

40.     On August 8, 2011, Defendant Brazil advised Sutana that after raises were approved for other employees that if she (Sutana) put in a request for a raise for herself and one other employee that she (Brazil) would approve them.

41.     On August 17, 2011, Sutana filled out a "Request for Human Resources Action" for an "In Pay Band Increase".   The form was approved by Saenz, ASD, while Defendant Brazil's approval was so noted on a post-it note forwarded to the Defendant Jackson. Saenz, ASDD, signed approval for Sutana's raise on the HR Form on August 26, 2011.

42.     In November 2011, Sutana, due to the long hours she was working and the hostile work environment began to experience serious medical problems which included, but were not limited to, depression and anxiety.

43.     In December 2011, Sutana requested permission to take vacation.   While the request for vacation was granted, Sutana was called and sent e-mails by Saenz, ASDD, daily requesting that she return early from her vacation.

44.     On January 26, 2012, Saenz, ASDD, advised Sutana that her raise was pending a desk audit.   On March 8, 2012, Saenz, ASDD, advised Sutana that Defendant Brazil needed to sign off on Sutana's pay raise paperwork.

45.     On February 21, 2012, Sutana requested Mediation with Saenz, ASDD, and the Defendant Brazil.   An agreement was reached and signed by the Defendant Brazil and Sutana, however, the Defendant Brazil never abided by the agreement.

46.     In late February 2012, Sutana spoke with her immediate supervisor Saenz, ASDD, regarding her medical issues which included high anxiety, increased depression, vision issues, hair falling out, and stomach problems.   Sutana wanted to take leave under FMLA, however, Saenz, ASDD, discouraged Sutana from taking leave due to the large workload.

47.     In early March 2012, Saenz, ASDD, was removed from ASDD and Defendant Brazil became Sutana's immediate supervisor.

48.     On March 26, 2012, Defendant Jackson, refused to discuss Sutana's pay raise and dismissed Sutana's request to discuss any other issues.

49.     In April 2012, Sutana met with Defendant Barela to discuss her alleged performance issues.  Defendant Barela advised Sutana that he was not aware of any performance issues and that he was happy with Sutana's performance.

50.     On April 24, 2012, Sutana asked Defendant Jackson, via e-mail, what she needed to submit to Human Resources in order to request and get approved for medical leave under FMLA.  Defendant Jackson, EDD's "Human Resources Bureau Chief", mislead Sutana by telling her that all she need is a "… letter from the doctor will be fine."  Fortunately, Sutana, upon further inquiry she discovered that FMLA specific forms were required and must be completed in order to apply for, get approved for and take medical leave under FMLA.  Despite his titles as EDD's "General Counsel and Human Resources Bureau Chief", Defendant Jackson intentionally failed to provide Sutana with the necessary information and forms required for taking Family Medical Leave under FMLA.

51.     Sutana due to the hostile work environment, discriminatory treatment and harassment, filed a request for "Family and Medical Leave".  Sutana obtained an "Employee's Serious Health Condition Medical Certification Statement from her medical doctor.  The doctor noted that "Patient is having severe anxiety causing panic attacks leading to black outs, daily dizziness, palpitations, nausea, insomnia, explosive diarrhea."  It was noted that the symptoms "… will impair any normal individual to perform his or her job competently.  The stress level Danni experiences at current work environment are detrimental to her health."

52.     On April 26, 2012, Defendant Brazil, filed the "Employer Response to Employee Request for FMLA".  It was approved due to Sutana's "… serious health condition that makes you unable to perform the essential functions of your job …".

53.     After Sutana disclosed her serious medical conditions, Defendant Brazil began to harass Sutana.  The Defendant Brazil on April 27, 2012, asked Sutana if she was suffering from Post-Traumatic Stress Disorder ("PTSD") because she came from Laos.

54.     Sutana began her medical leave on April 30, 2012 and was due to return to work on May 25, 2012.  However during the period of her medical leave Defendants Brazil and Jackson interfered with her leave by requiring that Sutana continue working during the period of her medical leave.  Sutana was required to answer e-mails, take telephone calls and work part-time on Tuesdays and Wednesdays, all during the period of her medical leave.  Due to the amount of work she was doing and required to do on medical leave, Sutana did not feel that she was actually on medical leave.

55.     After returning from medical leave the Defendant Brazil became progressively more hostile towards Sutana. This hostility included Defendant Brazil leaving Sutana out of EDD meetings. Sutana was then regulated to getting information and data she needed to perform her job from second hand sources. When Sutana questioned Defendant Brazil about the meetings and why she wasn't invited, Defendant Brazil simply did not answer Sutana's legitimate questions and continued to meet with Georgette behind closed doors.

56.     Post Sutana's medical leave, Defendant Brazil alleged that Sutana had failed to deposit ISO funds into the EDD accounts because another ASD employee, Georgette, could not find any revenues. Sutana refuted Defendant's accusations.

57.     On another occasion, in order to belittle Sutana in front of other State employees, Defendant Brazil asked Sutana if she eats "monkeys or dogs".

58.     On June 15, 2012, Sutana filed her EEOC Complaint against EDD alleging discrimination based upon her disability.  The Complaint's particulars include the allegation that Sutana's "supervisor", which at the time was the Defendant Barbara Brazil, had harassed her and made insensitive comments regarding people with disabilities.

59.     On July 10, 2012, Defendant Jackson sent Sutana a Notice of Contemplated Personnel Action ("NCA".  The notice contained six (6) bullet points that included: (1) becoming involved in an issue with the New Mexico Board Authority's budget; (2) wasting Defendants' Brazil and Jackson time (half hour) in an attempt to resolve an issues; (3) a request for a follow-up meeting from Cathy Meyer of DFA's Central Payroll; (4) Ms. Chavez inquiry if a meeting had taken place; (5) Sutana's response being "rude and condescending" and allegations of "oral reprimands" from supervisors; and (6) Sutana's attitude creating a hostile work environment for co-workers.  While the NCA alleges "progressive discipline", it failed to set forth what instances there were of "progressive discipline" being instituted against Sutana.

60.     On July 11, 2012, Defendant Jackson issued to Sutana a second NCA in which EDD was considering taking personnel action, including termination, for violating Governor Martinez's e-mail policy in which Sutana "copied" her personal e-mail account on a department e-mail.

61.     On July 20, 2012, Sutana submitted her Response to the July 10, 2012, NCA and to the July 11, 2012, NCA.  In regards to the July 10th NCA, Sutana refuted the allegations and pointed out the misstated claim that EDD had taken progressive disciplinary steps against her. In regards to the July 11, 2012, NCA Sutana advised Defendant Jackson that the Governor's e-

mail policy had never been provided to her.  Further, Sutana responded that the NCA comes three weeks after she filed her EEOC Complaint.

62.    On July 25, 2012, Sutana filed an Amended Charge of Discrimination in which she alleges "retaliation" and being "written up for allegedly creating a hostile work environment ...".

63.    On July 31, 2012, Defendant Jackson issued a Notice to Sutana that EDD was withdrawing the NCA dated July 10, 2012, regarding her "attitude toward and communications with your co-workers".  At the same time Defendant Jackson issued a Notice of Final Personnel Action ("NFA") related to the July 11th NCA and concerning the Governor's e-mails policy.  The NFA stated that the "… Department takes no personnel action against you …".

64.    On September 7, 2012, Defendants Barela and Jackson instructed Sutana to leave the EDD premises with her personal property.  Simultaneously, Defendants Barela and Jackson issued to Sutana a NCA and Notice of Disciplinary Action ("NDA").  Defendants advise Sutana that an investigation was pending and she was placed on administrative leave.  Sutana was ordered to have no contact with any EDD employees or any other employees that she had worked with for the State of New Mexico.

65.    On September 10, 2012, while Sutana was on administrative leave she was advised that the September 7, 2012, NCA and NDA were both withdrawn.

66.    On September 12, 2012, Sutana filed a second EEOC Complaint alleging discrimination based upon "National Origin".  In the particulars, Sutana states that she has been subjected to negative comments about her Race/National Origin and that "Deputy Secretary Brazil asked her if she 'ate dogs and monkeys' ".  Further, Sutana stated that Defendant Brazil

had asked her if she had PTSD because she is from Laos.   Sutana alleged a hostile work environment existed due to the acts of the Defendants.

67.     On September 19, 2012, Defendant Barela issued *another* NCA to Sutana alleging incompetence in her ability to perform her job as the Finance Manager for EDD.

68.     On October 2, 2012, Sutana timely filed her Response to the NCA in which she refuted all the charges and raised her counterclaims of discrimination, retaliation and hostile work environment.

69.     On October 3, 2012, Defendant Barela issued a NFA in which Sutana's employment was terminated.

70.     On October 29, 2012, Sutana timely filed a Notice of Appeal of the NFA with the State Personnel Board.   The SPB matter was resolved through settlement on or about June 16, 2014.

**COUNT I**

**VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT ("NMHRA"), N.M.S.A. 1978, § 28-1-7**

71.     Sutana hereby adopts and incorporates by reference paragraphs 1 through 70 as set forth above.

72.     At the time of the adverse actions complained of, Sutana was qualified to perform the job duties and responsibilities assigned to her.

73.     Because of her disability, Sutana was subjected to a hostile work environment, retaliation and eventually terminated.

74.     Defendant NMEDD knew *that* Sutana, at the time of the adverse actions *taken*, had a serious medical condition within the meaning of the NMHRA.   Sutana's hearing loss, Bi-Polar Disorder, and severe anxiety and panic attacks substantially impaired the major life

activity of working. Defendant NMEDD made no attempts at any time to accommodate Sutana's serious medical condition, although such accommodations could have been provided.

75.    Defendant NMEDD's discriminatory actions against Sutana occurred under circumstances raising a reasonable inference that her serious medical condition was a determining factor in Defendant NMEDD's decision to unfairly discipline Sutana, terminate her, and subject her to a hostile work environment.

76.    Defendant's adverse actions were in violation of the NMHRA.

77.    As a direct and proximate result of said intentional and discriminatory conduct, Sutana has lost wages and other benefits; her future earning capacity has been substantially impaired; she has suffered severe emotional distress, humiliation, embarrassment, pain and suffering and loss of enjoyment of life; and she has suffered other non-pecuniary losses, all of which will be proven at the trial of this action.

78.    Defendant's discriminatory conduct exhibited a willful and/or reckless indifference to plaintiff's protected right to be free from discrimination related to her serious medical condition.

79.    Defendant had no legitimate, non-discriminatory business reason for taking adverse action against Sutana on the basis of her serious medical condition. Any reasons Defendant may put forth are merely pretext for discriminatory and retaliatory acts.

**COUNT II**

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

**RETALIATION**

80.    Sutana hereby adopts and incorporates by reference paragraphs 1 through 79 as set forth above.

81.     Sutana engaged in protected activity when she sought to enforce her rights and privileges under the ADA.

82.     Adverse employment actions were taken against Sutana by Defendant after Sutana engaged in asserting her federally-protected civil and statutory rights.

83.     A casual connection exists between Sutana's engagement in protected activity and the adverse employment actions complained of.

84.     Defendant had no legitimate, non-discriminatory business reasons for having taken adverse employment actions against Sutana.

85.     Any alleged legitimate, non-discriminatory business reasons which Defendant may put forth are merely pretext for Defendant's retaliatory acts.

86.     As a result of the retaliation Sutana suffered because of engaging in protected activities, she is entitled to damages in an amount to be determined a trial.

## COUNT III

### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
### and
### NEW MEXICO HUMAN RIGHTS CT ("NMHRA"), N.M.S.A. 1978, § 28-1-7

### HOSTILE WORK ENVIRONMENT

87.     Sutana hereby adopts and incorporates by reference paragraphs 1 through 86 as set forth above.

88.     Because Sutana applied for and took medical leave she was subject to working onerous work hours, harassing telephone calls, required to respond to EDD e-mails, required to work during her medical leave, asked humiliating and demeaning questions such as "do you eat dogs and monkeys and if she suffered from PTSD because she was from Laos.  Further, Defendant filed specious NCA against Sutana only to dismiss them after she responded.  The

hostility Sutana endured altered the rights, privileges and benefits of her employment with the Defendant.

89.    From April 2011 and March 2012, the onerous work load, refusal to provide a promised pay raise, a barrage of four (4) separate NCAs and a NDA, which were all withdrawn, a fraudulent EDD Response, filing the fraudulent EDD Response in her personnel file, as well as racially demeaning comments, created a hostile work environment which became so severe and pervasive that Sutana had to receive medical treatment related to workplace stress.

90.    Defendant knew of this hostile work environment, caused and contributed to it, and permitted this environment to continue over time.

91.    As a result of the retaliation Sutana is entitled to damages in an amount to be determined a trial.

## COUNT IV

## VIOLATIONS OF FAMILY MEDICAL LEAVE ACT

### INTERFERENCE

92.    Sutana hereby adopts and incorporates by reference paragraphs 1 through 91 as set forth above.

93.    At the time that Sutana considered filing her application for FMLA leave she was discouraged to do so by the Defendant.

94.    On March 25, 2012, when Sutana filed her application for FMLA leave she was eligible to receive it.

95.    Under Defendant NMEDD's regulations, Section 1.7.7.12 (F), Sutana could "not accrue annual and sick leave while on unpaid FMLA leave."

96.     The Defendant, EDD, and the Defendants, individually, Barela, Brazil and Jackson, during the period that Sutana was approved for *FMLA* leave, required her to work, answer telephone calls, respond to e-mails and be available part-time on Tuesdays and Wednesdays.  While Sutana was on FMLA leave neither the NMEDD nor any individually-named Defendant could interfere with, restrain, or deny Sutana the exercise of her FMLA rights.

97.     The Defendant NMEDD, and the Defendants, individually, Barela, Brazil and Jackson, decisions and actions related to interfering with Sutana's FMLA entitlement are related to her rights and privileges associated with FMLA leave.  These adverse employment actions were taken against Sutana because she chose to exercise her federally-protected FMLA rights.

98.     As a result of Defendants' acts and failures to act, Sutana suffered *damages* in an amount to be determined a trial.  Sutana claims she is entitled to liquidated damages against all named Defendants because the violations of her FMLA rights were willful, intentional, and wanton.

## COUNT V

## VIOLATIONS OF FAMILY MEDICAL LEAVE ACT

## RETALIATION

99.     Sutana hereby adopts and incorporates by reference paragraphs 1 through 98 as set forth above.

100.     Sutana engaged in protected activity under FMLA when she first made known that she desired to access FMLA leave she had accumulated.

101.     Adverse employment actions were taken against Sutana by Defendant NMEDD, and the Defendants, individually, Barela, Brazil and Jackson, after Sutana engaged in asserting her federally-protected civil and statutory rights uner the FMLA.

102.   A casual connection exists between Sutana's engagement in protected activity and the adverse employment actions complained of by Sutana above.

103.   Defendant NMEDD, and the Defendants, individually, Barela, Brazil and Jackson, had no legitimate, non-discriminatory business reasons for having taken adverse employment actions against Sutana because of the exercise of her FMLA rights.

104.   Any alleged legitimate, non-discriminatory business reasons which the Defendant NMEDD, and the Defendants, individually, Barela, Brazil and Jackson, may put forth are merely pretext for Defendants' retaliatory acts.

105.   As a result of the retaliation Sutana suffered because of engaging in protected activities, she is entitled to damages in an amount to be determined a trial, including, but not limited to liquidated damages for the willful, intentional, and wanton acts of all Defendants.

## COUNT VI

## VIOLATION OF 42 U.S.C. § 1983

## FREEDOM OF SPEECH/RETALIATION

106.   Sutana hereby adopts and incorporates by reference paragraphs 1 through 105 as set forth above.

107.   During the period of time Sutana remained employed with the NMEDD Sutana advised her supervisors within the NMEDD that the NMEDD was violating the New Mexico procurement code, that her supervisors were unlawfully engaged in conflicts of interest that resulted in financial gain to the individually-named Defendants and their acquaintances, and that the NMEDD was intentionally violating State procedures and policies in carrying forward its programs and responsibilities.

108.    At all times relevant to these notifications to NMEDD management, Sutana was speaking as a concerned resident of the State of New Mexico speaking out on matters of public concern.

109.    This speech exercised by Plaintiff constitutes protected activity within the meaning of the First Amendment of the United States of America, as enforced through 42 U.S.C. § 1983.

110.    The NMEDD and the individually-named Defendants' interests in Sutana's speech do not outweigh the constitutional interests of Sutana.

111.    Sutana's exercise of her First Amendment free speech rights constituted a substantial factor in a number of adverse employment actions taken against Sutana following her participation in protected speech.

112.    The adverse actions Sutana complaints, including, but not limited to, her termination and a number of threatened disciplinary actions, would not have occurred but for the exercise of free speech.  A causal connection exists between the adverse actions complained of and the protected speech.

113.    At all times relevant hereto, the individually-named Defendants acted under the color of state law.

114.    Sutana's exercise of her free speech was not sufficient to disrupt the operations of the NMEDD.

115.    There exist no legitimate, constitutional reasons for Defendants to have retaliated against Sutana for the exercise of her free speech rights and privileges.

116.    The retaliatory conduct Defendants subjected Sutana to would have deterred a similarly-situated employee from exercising his or her constitutional rights.

117.    Sutana is entitled to all remedies and relief available to her under 42 U.S.C. §

1983, including, but not limited to, punitive damages against the individually-named Defendants

for their willful, intentional, and grossly reckless conduct.

### COUNT VII

### 42 U.S.C. § 1983

### VIOLATIONS OF EQUAL PROTECTION

### FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

118.    Sutana hereby adopts and incorporates by reference paragraphs 1 through 117 as

set forth above.

119.    Sutana was subjected to a hostile work environment and adverse employment

actions because of her national origin, disabilities, and exercise of her free speech rights.

120.    The NMEDD and the individually-named Defendants selectively and adversely

subjected Sutana to disparate treatment and actions because of the protected categories and

activity set forth in paragraph 119.

121.    The unlawful acts and failures to act Sutana complains of constitute intentional

harassment and punishment for protected speech and classification.

122.    In subjecting Sutana to adverse employment actions such as the creation of a

hostile work environment, the purposeful violations of policies and procedures applicable to the

terms and conditions of her employment, unlawful prohibitions on protected speech, and other

adverse actions set forth herein, Defendants acted under the color of state law.

123.    When compared with other NMEDD employees, Sutana was treated differently

and deprived of workplace benefits, protections, and considerations given to other employees.

124.    The selective treatment Sutana complains of was motivated by an intent to discriminate against her on the basis of protected speech and classification.

125.    The hostile work envir5onment Sutana complains of was objectively severe and pervasive that a reasonable person would have found such to be hostile and/or abusive.

126.    Sutana did find the work environment to be hostile and abusive.

127.    The unlawful conduct Sutana complains of unreasonably interfered with her work performance and duties.

128.    Defendants appropriately failed to address Sutana's complaints of hostile work environment.  Although Defendants caused and knew of this hostile work environment, they did nothing to remediate it.

129.    Defendants have no legitimate business reasons for engaging in the unlawful conduct Plaintiff complains of.   Any reason put forward by Defendants is but a pretext for unconstitutional and unlawful conduct.

130.    Sutana is entitled to all remedies and relief available to her under 42 U.S.C. § 1983, including, but not limited to, punitive damages against the individually-named Defendants for their willful, malicious, intentional and grossly reckless acts and failures to act.

## COUNT IX

### VIOLATIONS OF THE FAIR LABOR STANDARDS ACT

### 29 U.S.C. § 201, et seq.

131.    Sutana hereby incorporates and adopts by reference paragraphs 1 through 130 as set forth above.

132.    It is undisputed that, as a matter of law, FMLA is unpaid leave.

133.    During the period of time Sutana was on FMLA leave, Defendants requested and required that Sutana repeatedly and regularly perform her normal job duties and responsibilities. The pattern of having Sutana perform work while on FMLA leave did not abate while Sutana remained on leave.  At allt times relevant hereto, NMEDD and the individually-named Defendants knew that Sutana was being required to work while on FMLA leave.

134.    The FMLA Share records show that Sutana was required to utilize other paid leave in order to be paid while on FMLA leave, although she was working standard hours for which she should have been compensated.

135.    The work performed by Sutana while on FMLA leave was substantial and constituted the type and nature of work Sutana routinely performed as a NMEDD employee.

136.    The FLSA requires that an employer pay an exempt employee on leave a proportionate part of an employee's wages for work performed while on leave.

137.    Defendants did not pay Sutana while she performed work on FMLA leave in accordance with the mandates of the FLSA.

138.    At all times material hereto, Defendant NMEDD and the individually-named Defendants were "covered employers" within the meaning of the FLSA and Sutana a "covered employee."

139.    In addition, the FLSA and the personnel rules pertaining to Sutana require that an employee who loses compensatory time off.  The FLSA and New Mexico personnel rules also require that an employee such as Sutana be paid appropriate overtime.

140.    Sutana never signed off on a written agreement to receive compensatory time off in lieu of being paid overtime.  Despite this fact, Defendants refused to pay Sutana for overtime

worked and forced her to lose significant amounts of compensatory time because of the enormous work load imposed on her.

141.    The Defendants violations of the FLSA constitute "willful conduct" under the provisions of the FLSA.  Furthermore, these violations were engaged in with a lack of good faith.

142.    As a result of Defendants' unlawful conduct, Sutana has suffered damages and is entitled to all remedies and relief available to her under the FLSA for the violations noted hereinabove, including, but not limited to, liquidated damages for the willful and bad faith conduct of all Defendants.

## COUNT X

## VIOLATION OF THE WHISTLEBLOWR PROTECTION ACT

143.    Sutana hereby adopts and incorporates by reference paragraphs 1 through 142 as set forth above.

144.    As the Finance Manager for New Mexico Economic Development Department ("EDD"), Sutana was responsible for preparing, amongst other things, EDD's budget, budget requests and operating budget.  This included knowledge and understanding about the NMITC, the SHARE system and the procurement code for the State of New Mexico.  Sutana was responsible for helping the CFO, Saenz, make sure EDD operated in a fiscally prudent, proper and responsible manner.

145.    Defendants, Barela, Brazil and Jackson, however, were more concerned about firing employees, securing tax credits for a company they had either ownership interest in (Barela) or had invested in (Brazil) and taking control of the procurement process by signing purchasing agreements (Jackson) and avoiding statutory responsibilities to enforce the State

Procurement Code, the NMITC program, and the State Personnel Board's Rules and Regulations.

146.   As a result, Sutana was often the target of the hostility and vengeance of Defendants, Barela, Brazil and Jackson, because she blew the whistle on the procurement code violations and the improper activities occurring in the NMITC program.

147.   Sutana, on several occasions, raised concerns about  procurement code violations and contracts not being signed by the CFO nor was a Memorandum produced by the CFO for certain contracts, she was told by Saenz that Defendant Brazil, did not want EDD to use the term "Procurement Code Violations". Defendants, Barela, Brazil and Jackson, met those concerns with deaf ears.

148.   In addition to raising concerns about procurement code violations, Sutana raised concerns, prior to her termination, about a company, CEREA, a company founded by Defendant Barela, and invested in by Defendant Brazil, and possible improper investment tax credits being processed through EDD.  Defendants Barela, Brazil and Jackson, met those concerns with deaf ears.

149.   Unable to cure these unlawful and improper acts internally, in late June or early July 2012, Sutana reached out to the New Mexico Attorney General's Office by e-mail for assistance and halting some of the practices that Sutana reasonably and in good faith believed constituted unlawful and/or improper acts.   A true and correct copy of the letter of acknowledgment from the Attorney General's Office is attached hereto as Exhibit A.

150.   In October 2012, Sutana's employment was terminated for allegedly being incompetent and/or insubordinate.  Defendants provided no legitimate reason or non-retaliatory reason for Sutana's termination.

151.    Upon information and belief, Defendants Barela, Brazil and Jackson, orchestrated Sutana's termination in retaliation for Sutana's (a) internal complaints about procurement code violations which constitute violations of New Mexico law, malfeasance, waste and abuse of authority; (b) communications to the Attorney General seeking assistance to enforce the state procurement code and halt the practices that Sutana reasonably and in good faith believed constituted unlawful and/or improper acts; and (c) communicating to Brent Eastwood and Saenz that she reasonably and in good faith believed that CERELINK, a company owned by the Defendant Barela and invested in by Defendant Brazil, was improperly seeking tax credits through the EDD.

152.    Defendants NMEDD, Barela, Brazil and Jackson, qualify as "public employers" under the New Mexico Whistleblower Act ("WPA"), N.M.S.A. 1978, § 10-16C-2(1) and (4).

153.    Sutana qualifies as a "public employee" under the WPA, N.M.S.A. 1978, § 10-16C-2(B).

154.    Sutana's internal complaints and communications to Brent Eastwood, Saenz, Defendants Barela, Brazil and Jackson and others about violations of New Mexico law, malfeasance, waste and abuse of authority constituted good faith disclosures of unlawful or improper acts by the Defendants NMEDD, Barela, Brazil and Jackson within the meaning of the WPA.

155.    Sutana's late June or early July e-mail to the Attorney General and Defendants, constituted good faith disclosures of unlawful or improper acts by the Defendants NMEDD, Barela, Brazil and Jackson within the meaning of the WPA.

156.    Upon information and belief, Defendants EDD, Barela, Brazil and Jackson, terminated Sutana in October 2012 in retaliation for Sutana's protected activities under the WPA.

157.    Defendants violated the WPA on the basis of the allegations and facts set forth herein.

158.    As a result of Defendants' violations of the WPA, Sutana has suffered actual damages in the form of lost past wages and future wages, and special damages.

159.    Sutana, therefore, is entitled to actual damages, reinstatement with the same seniority status that she would have had but for the violation, two times the amount of back pay with interest, special damages, litigation costs and reasonable attorney's fes pursuant to the WPA, N.M.S.A. 1978, § 10-16C-4(A).

## COUNT XI

## VIOLATION OF THE FRAUD AGAINST TAXPAYERS ACT

159.    Sutana hereby adopts and incorporates by reference paragraphs 1 through 158 as set forth above.

160.    Sutana's internal complaints and communications to Defendants EDD, Barela, Brazil and Jackson and others about violations of New Mexico law, malfeasance, waste and abuse of authority and her June or July e-mail to the Attorney General and Defendants were lawful acts in disclosing information to a government or law enforcement agency within the meaning of the Fraud Against Taxpayers Act ("FATA"), NMSA 1978, § 44-9-11(B).

161.    Defendants' termination of Sutana was, upon information and belief, retaliation for Sutana's internal complaints and communications to Defendants and others about violations

of New Mexico law malfeasance, waste and abuse of authority and e-mails to the Attorney General and Defendants.

162.    Defendants' retaliatory conduct against Sutana constitutes violations of the FATA.

163.    Upon information and belief, Defendants retaliation was willful, wanton, and/or in reckless disregard for Sutana's rights.

164.    As a result of Defendants' violation of the FATA, Sutana has suffered actual damages in the form of lost past and future wages and special damages.

165.    Sutana therefore, is entitled to actual damages, reinstatement, two times the amount of back pay with interest, special damages, punitive damages, and reasonable attorney's fees pursuant the FATA, NMSA 1978, § 44-9-11 (C).

## COUNT XII

## BREACH OF SETTLEMENT AGREEMENT

166.    Sutana hereby adopts and incorporates by reference paragraphs 1 through 165 as set forth above.

167.    The parties entered into a contractual agreement through a Settlement Agreement and Release ("Release") finalized between the parties in late May 2014.  The Release pertained exclusively to the issues raised during the administrative State Personnel Board proceeding.

168.    By its very provisions, the Release " [is] not intended nor does it concern any of the claims and matters currently pending in the Federal District Court for the District of New Mexico, Case 1:13-cv-00210-SMV-RHS . . ."

169.    The Release provided that Sutana would be permitted to amend her complaint to include a claim for damages should she not be reinstated into a position with the State of New Mexico by July 11, 2014.

170.    Sutana was not reemployed with the State of New Mexico by July 11, 2014.

171.    The Release further stated that the NMEDD would pay Sutana back wages from the date of the Release to June 30, 2014 or reinstatement.

172.    The NMEDD has breached this provision of the Release by not paying Sutana the agreed-upon back wages.

173.    The Release also provides that Defendants would "make a good faith effort to reinstate Appellant [Sutana] to a comparable position with the State of New Mexico."

174.    Defendants breached this provision of the Release by not making good faith efforts to reinstate Sutana to a comparable position.

175.    As a result of these breaches of the Release, Sutanan has suffered damages in an amount to be determined at trial.

## DAMAGES

**WHEREFORE**, Sutana respectfully requests this Court grant her judgment in her favor and any further relief the Court deems just and appropriate under the circumstances, including:

176.    Two times the amount of past lost wages and benefits with interest;

177.    Past, present, and future lost wages and benefits;

178.    Mental, emotional, and psychological distress;

179.    Special Damages;

180.    Liquidated damages;

181.    Pre-judgment and post-judgment interest;

182.    Punitive or exemplary <u>damages under FATA, N.M.S.A. 1978, § 44-9-11 (C) or any other rule or statute;</u> and

183.    Award of attorney fees and costs allowable under statute and rule.


Respectfully submitted,

LAW OFFICES OF MICHAEL E. MOZES, P.C.

***/s/Michael E. Mozes***
MICHAEL E. MOZES
5732 Osuna Rd. NE
Albuquerque, NM 87109-2527
(505) 880-1200
(505) 881-2444 (fax)
Michael@mozeslawoffice.com


**I HEREBY CERTIFY** that a copy of
the foregoing pleading was sent to opposing
counsel of record, Christopher T. Saucedo, Esq.,
via e-mail on this 21st day of October 2014.

*/s/ Michael E. Mozes*
Michael E. Mozes