**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DANNI SUTANA,

   Plaintiff,

vs.          Case No.: 1:13-CV-00210-JCH-LAM


STATE OF NEW MEXICO, ECONOMIC DEVELOPMENT DEPARTMENT;
JONATHAN ("JON") BARELA, individually and in his official capacity;
BARBARA G. BRAZIL, individually and in her official capacity;
WADE JACKSON, individually and in his official capacity;

   Defendants.

**NEW MEXICO FIRM, LLC'S RESPONSE TO PLAINTIFF'S**
**MOTION TO RELEASE LIEN OR, ALTERNATIVELY, MOTION**
**TO REDUCE AMOUNT OF LIEN**

   **COMES NOW** the New Mexico Firm, LLC [hereinafter "Firm"] (Nathaniel V. Thompkins) and for the Firm's Response to Plaintiff's Motion to Release Lien or, Alternatively, Motion to Reduce Amount of Lien, and states as follows:

**I.**   **Introduction**

   The Firm's charging lien was filed on May 28, 2015 and relates only to the services that were provided to Plaintiff in filing her Complaint in the First Judicial District Court and Amended Complaints in both the state court and New Mexico's Federal District Court. Plaintiff entered into a Settlement Agreement, regarding the State Personnel Office (hereinafter "SPO") case, and Plaintiff agreed, without objection to the Firm retaining partial of its attorney fees in the amount of $50,000. Plaintiff, after June 2014, did nothing other than file a Disciplinary Board Complaint against the Firm and did not take any other action to dispute the attorney fees invoice which was provided to her in the SPO case. Plaintiff now improperly uses the charging lien filed in the instant Federal case to challenge both the Settlement Agreement and related

attorney fee invoice related to the SPO case. Plaintiff's instant motion for services rendered in the Complaint which was filed in the State District Court and removed to the Federal court contains plain misstatements of facts and other false statements in order to minimize the value of the services performed by the Firm on Plaintiff's behalf.

Plaintiff's counsel, Michael Mozes, Esquire, has stated that Judge Martinez, who will hear the Plaintiff's instant motion, has already indicated her pre-disposition and stated her opinion on this matter without the Firm's benefit of having any involvement in the presentation evidence or facts. [Exhibit W]. The Firm was not present when the alleged comments were made and cannot provide any information other than raise a concern and asks for Judge Martinez to consider having another Judge hear Plaintiff's motion.

After Plaintiff signed the initial engagement letter dated September 11, 2012, the Firm began preforming extensive pre-litigation research on the serious and complex issues raised in the SPO case. In the SPO case the State alleged that Plaintiff had been discharged for cause because she had committed critical errors involving certain budget requests and budgets submitted for the New Mexico Economic Development Office (hereinafter "NMEDD") for the years 2013 and 2014. Additionally, the State's position in the SPO case was that Plaintiff had created a hostile work environment, illegally entered into another employee's office, was insubordinate and made racially demeaning comments about another co-worker.

The only overlap that Plaintiff's Complaint had with the SPO case concerned what would happen if the State were successful in its defense that it had just cause to terminate Plaintiff's employment. If the State were able to prove that it had just cause, Plaintiff's claims in her separate suit against the state and related to retaliation and hostile work environment would be subject to dismissal. The factual allegations and burdens of proof in the SPO case were entirely

different than the facts and burdens of proof in Plaintiff's claims in her Complaint and Amended Complaints pending in the Federal court. Therefore, if Plaintiff wanted to continue with her claims of retaliation it would important that she defend against the State' just cause basis for the termination of her employment.

It is important for the court to be aware of the fact that Plaintiff suffers from a Bi-Polar disorder. This is asserted by Plaintiff as one of the conditions set forth in her state district court Complaint, page 2, ¶ 7. [Exhibit A]. Plaintiff filed an Amended EEOC charge against the New Mexico Economic Development Department on June 15, 2012 prior to hiring the Firm. [*Id.* pgs.27-8]. However, while the Firm was handling the SPO case, Plaintiff, before the EEOC completed its investigation and made a ruling, prematurely requested a right to sue letter from the EEOC.  This was contrary to the advice given to her by the Firm and would be the first of many instances where Plaintiff wrote e-mails acting as her own attorney, threatening to act as her own attorney and threatening that she hired another law firm to handle the SPO case. As a result of Plaintiff's premature request for a right to sue letter from the EEOC, she was then required to file her Complaint against the Defendants within 90 days of the letter being issued by the EEOC. As a result, Plaintiff requested that the Firm use the first engagement letter for her contemplated Complaint in district court and have a separate hourly agreement for the SPO case. The Firm drafted an hourly fee engagement letter and Plaintiff signed the engagement letter for an hourly fee agreement related to the SPO case.

## II.      The Firm Disputes Plaintiff's Factual Allegations

1.      The Firm admits that it initially entered into a contract with Plaintiff dated September 11, 2012. However, the contract was a "hybrid Contingency Fee and Retainer Fee" agreement. The requested retainer in the amount of $10,000 to cover both "attorney fees and

costs." [*Doc.114-1*, pg.1, ¶ # 3]. The fee agreement provided that "[t]he fees and costs relating to this matter are not predictable. Accordingly, we have made no commitment to you concerning the maximum fees and costs that will be necessary to resolve or complete this matter." [*Id.* pg. 2, ¶ # 4]. After Plaintiff, without the advice of counsel, requested a Right to Sue letter from the EEOC, Plaintiff requested that the Firm have two separate fee agreements. The SPO case Plaintiff wanted to pay on an hourly basis and Plaintiff insisted that her Complaint against the Defendants be handled under the hybrid fee agreement contract. On December 1, 2012, Plaintiff signed an hourly fee agreement for the Firm's handling of the SPO case with a retainer of $5,000. [Exhibit C, pg.1, ¶ 1]. The agreement expressly provides that the Firm is "providing legal advice pertaining to the above-referenced matter; any other advice is not within the scope of this representation." [*Id.* pg.1, ¶ 1]. Plaintiff requested that the September 11, 2012, fee contract cover her civil lawsuit Complaint with a $10,000 retainer. [*Doc.114-1*].

2.    The Firm admits that it entered into an hourly fee agreement for handling the SPO case. However, the Firm denies that it was because the matter had stalled and this is one of Plaintiff fabricated statements intended to support her false allegations. Attached hereto as Exhibit B is a letter dated February 28, 2013, in which the first hearing officer, R. Scott Summerfield, advises the Firm that he would be retiring on May 31, 2013. As noted in the letter, Appellee's new counsel had filed a Motion to Vacate and Reschedule the SPO hearing and the hearing officer was seeking a Response form the Firm. The Appellee's motion was subsequent to and in part because the Firm filed a Motion to Disqualify Appellee's counsel, Wade Jackson, on December 23, 2012. [Exhibit E]. As a result of the Firm having filed the Motion counsel for the State, Wade Jackson, withdrew from representing the State. In addition, on April 8, 2013, the case was reassigned to ALJ, Leonard J. Padilla. [Exhibit GG].

On September 6, 2013, after the third (3rd) Administrative Law Judge's employment was terminated the Firm wrote to Judge Scott and stated that the by the SPO and the Firm wanted to discuss having the stay lifted in the Federal case. [Exhibit G]. Given the fact that the third Administrative Law Judge's employment was not terminated until sometime in August or September 2013, Plaintiff's statement that Firm sent her an amended engagement letter because the SPO case had stalled is blatantly false and misleading.

An amended engagement letter was sent at the request of the Plaintiff as she did not want the SPO case handled under a hybrid contingency fee agreement. [Exhibit F]. The Firm had offered to collect its attorney fees in the SPO case when the Federal case was settled. Plaintiff agreed to this arrangement via e-mail on January 21, 2013 [*Id.*] and requested a "revised contract". [*Id.*]. However, when the Firm sent Plaintiff the amended engagement letter [Exhibit D] Plaintiff changed her mind and refused to sign the amended agreement. Plaintiff, thereafter, made no payments on the outstanding fees and was in breach of the written fee agreement she signed with the Firm. Plaintiff's behavior in the amended fee agreement matter became evidence of a pattern of duplicitous actions which she would take in her case.

3.    The Firm had an engagement letter dated September 11, 2012 which the Plaintiff signed and covered the only active employment matter, at that time, which was the SPO case. A second fee agreement, dated December 1, 2012, resulted because Plaintiff, after receiving a right to sue letter from the EEOC, wanted the Firm bill separately on the two cases. Plaintiff requested that the SPO case be handled on an hourly fee basis and that her Complaint be handled under the original September 11, 2012 fee agreement.

Plaintiff's implication that the firm provided services without a written agreement is both false and misleading. More importantly, the Charging Lien filed by the Firm is related to services

rendered in the Complaint filed by Plaintiff and removed to the Federal Court not the SPO case. The SPO case and attorney fees were agreed upon by Plaintiff after she paid nothing beyond the Firm's initial invoice and acknowledged that she had an outstanding balance of $3,142.19. [Exhibit H, 1/20/2013 e-mail, bottom of exhibit]. Plaintiff feigned acceptance of the amended agreement was done to induce the Firm into not collection on the outstanding balances, whereupon she changed her position by not signing the agreement she requested.

4.      The Firm denies Plaintiff's allegations contained in paragraph # 4. The Firm's opinion in *Doc.114.3* was expressed by the Firm's paralegal not the attorney, Nathaniel V. Thompkins. Further, e-mail relied upon by Plaintiff has been misrepresented by the Plaintiff. The Firm's opinion that the cases are related does express the opinion that there is "significant overlap at all times existed". As the Firm presented above, Plaintiff's claims as set out in her Complaint include allegations of "retaliation". There is no alleged significant overlap. The specific charges raised by the State in the SPO action and which would negatively impact many of Plaintiff's claims in her own civil lawsuit, is that Plaintiff was terminated for "just cause". [Exhibit K, pgs. 6-9, ¶¶s # 2-40]. The ALJ in denying the State's Motion to Dismiss expressly held that, "Sutana raises issues going to EDD's just cause basis for imposing disciplinary action … EDD has the burden of persuasion to prove allegations in the NFA[1] by a preponderance of the evidence,[2] that the dismissal is appropriate, and EDD followed applicable procedural

---

[1] NFA stands for Notice of Final Action.

[2] In ADA cases the burden of proof applied by the federal court is the *McDonnel Douglas Corp. v. Green* proof structure. Plaintiff establishes a prima facie case by proving membership in the protected class. Counts I, II and III carry this burden of proof which is not a preponderance of evidence standard. Counts IV, V and IX are retaliation claims under the Family Medical Leave Act (IV and V) and which are also analyzed under *McDonnel Douglas Corp. v. Green and Price Waterhouse* standards. Count VI is a claim for breach of contract, this claim would not be heard by the SPO and therefore the factual predicates do not overlap with the SPO Appeal. Count VII is a claim of discrimination which is either direct evidence or circumstantial evidence. In circumstantial evidence cases, the plaintiff must present sufficient evidence about the challenged action to constitute circumstantial evidence that he or she was discriminated against because of some prohibited characteristic (e.g. sex or race under Title VII, or sexual orientation under ENDA). Count VIII and X are, respectively, Sec. 1983 Freedom of Speech and First Amendment

requirements." [Exhibit N, pg.3, ¶ 4]. If the State prevailed on their defense in the SPO case, her civil lawsuit claims would be adversely impacted.

Plaintiff herself sent an e-mail on May 20, 2014, in which she wrote, "[c]an you please get started in the suit? I talked to a retired judge and she said at this point everything (SPO) will start from the beginning." [Exhibit JJ]. At least from Plaintiff's understanding having spoken with a retired Judge she understood that the lawsuits were different and there was no "overlay". Plaintiff's e-mails not only contradict her motion but also her various e-mails where she reverses course from unwarranted threats and incorrect statements of fact.

The Firm's paralegal correctly made the connection of the possible negative impact the SPO case could have on Plaintiff's civil lawsuit. The Firm's dispute Plaintiff's misrepresentation of the facts and opinions of the Firm as set forth in paragraph # 4 of her Motion. [Exhibit H, 1st e-mail dated 1/20/13]. If the Court compares the 1st Complaint [Exhibit A], the 3rd Amended Complaint [Exhibit L] and the SPO Stipulated Pre-Trial Order [Exhibit K] there is no significant factual overlap as alleged by Plaintiff. In fact, the ALJ does not have the jurisdiction or authority to hear and decide the claims alleged by Plaintiff in her civil lawsuit Complaint.

5.      The Firm admits that it filed Plaintiff's Complaint on December 29, 2012 and Amended the Complaint on January 8, 2013. However, the Firm had the Defendants served all the Defendants between January 31, 2013 and February 19, 2013 for a cost of $324.56. [Exhibit I]. The Firm admits that the case was removed to the Federal Court by the Defendants on or about March 4, 2013.

6.      The Firm denies Plaintiff self-serving description of the SPO case as set forth in

---

Fee Speech, the burden for plaintiff under these claims is to prove that the acts of the defendant deprived the plaintiff of particular rights under the U.S. Constitution. As noted in the Hearing Officer's decision plaintiff's burden of proof in the SPO case does not involve any of the burdens for the claims made by plaintiff in her complaint which was filed in the State District Court and subsequently removed to the Federal Court. The factual predicates for each of plaintiff's claim do not have significant overlap as she alleges.

paragraph # 6. The SPO case was highly contested and there was no "standard" motions filed in the case. First, the State filed a motion to dismiss which the Firm filed a Response on November 15, 2012. The hearing officer denied the motion. As already mentioned above, the Firm filed a motion to disqualify the State's counsel on December 23, 2012. This is not a routine practice in any administrative or civil litigation cases. The State, in Response to the Firm's Motion, filed a Motion to withdraw its original counsel and substitute an outside firm. On December 28, 2012, the hearing officer issued an Order granting the substitution of counsel and mooting the Motion to Disqualify filed by the Firm. [Exhibit J].

Over 10 days, December 1, 2012 through December 10, 2013, the Firm worked on the Stipulated Pre-Hearing Order with Plaintiff and the State's new counsel. [Exhibit K].

Concerning Plaintiff's allegations about the depositions, even if the Firm made a typographical error on the date, Plaintiff cannot deny that the witness(es) were in fact deposed. Regarding the preparation and actual deposition time, Plaintiff ignores the Rule 16-105 (A) (1) provisions that takes into consideration: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly. As noted in Exhibit K, the SPO case involved Plaintiff's performance in putting together certain budget requests and budgets for the Fiscal Years, 2013 and 2014. [Exhibit K, pg.6, ¶¶s 2-6]. Plaintiff stated that she relied upon an employee at the DFA in preparing the two budget requests as she had never put together a budget request prior to being employed a NMEDD. Plaintiff's prior position as a budget analyst described her duties as "she assists other state agencies in preparing request for proposals (RFPs) for computer services. She previously worked with invitations for bids (ITBs) GSAs, and RFPs for other, non-IT procurements, at SPD assisting various state agencies with their procurements." [Exhibit O]. The DFA's website lists forty-five

forms related to the "Budget Preparation System" and "Performance Based Budget System".[3]

Although the 2013 and 2014 documents are not currently listed on the DFA website the certain documents are updated documents by date only and involved in the budget requests and budgets submitted by the Plaintiff to the DFA. It is clear that this is a highly specialized area requiring both specialized training and education. The process is both time consuming and addresses difficult questions. Understanding of this area required the Firm to utilize consultants not only for preparation for the depositions but also in preparing Plaintiff's defense to the State's allegation of just cause for termination based specifically performance involving the budgets. The FY13 budget was revised after Plaintiff's submission to the DFA. [Exhibit P]. The attached e-mails discuss the changes to Plaintiff's submission and NMEDD'S re-submission to the DFA. [*Id.*]. Plaintiff's attempt, in paragraph # 6, to simplify the SPO case in order to claim that the Firm's fees are unreasonable and out of line should be dismissed out of hand as Plaintiff herself could not, without the assistance of DFA specialist perform the task of creating both the budget requests and budgets.

The State produced over 339 pages of documents related to the budget request for FY13. Because the State's discovery responses were deficient as they failed to correlate the documents in response to the specific request for production of documents, the Firm was forced to file a motion to compel. Additionally, this left the Firm to sift through five hundred and seventy-six (576) pages of discovery in order to prepare for the deposition. Also, as will be addressed below, because one of the main issues in the SPO case involved the area of Human Resources, Dr. Kliener was consulted to discuss the State's Human Resources policies and actions. A full hearing was held before the Jessica Copper the 4th ALJ assigned to the case after the 3rd ALJ was

---

[3] The State's Department of Finance and Administration's ("DFA") forms are located at
http://www.budget.nmdfa.state.nm.us

fired by the SPO. Regardless of the shuffle Plaintiff's Motion to Compel was granted by Leonard Padilla.

The State sent discovery to the Plaintiff, which the Firm spent considerable time objecting to and successfully defending its objection in the State's dispute of Plaintiff's answers and responses. The Firm put together over 500 pages of Bates Stamped documents that were responsive to the State's request for production of documents. The documents required the Firm to review all e-mails, the personnel file, the budget requests, and numerous contracts for NMEDD and the agencies under it. To claim that the SPO was a routine type of case is disingenuous at best and worse, a false statement of fact given Plaintiff's knowledge of the lengthy process and time consuming aspects of the Firm's defense of Plaintiff in the SPO case.

Throughout the course of the litigation, the State initially refused to schedule depositions, which the Firm ultimately was forced to write to both the Judge Cooper and Ms. Kilgore to request that the Defendants scheduled depositions and provide additional discovery. [Exhibit U and Exhibit X]. A second law firm entered its appearance in place of Ms. Kilgore and the difficulty with discovery became even more blatant and the hearing officer was again called in to intervene. [Exhibit S]. Plaintiff's attempt to minimize the amount of work and time the Firm expended in this difficult case should be dismissed.

The Firm issued subpoenas to the DFA [Exhibit M] and spoke with the DFA employee in order to validate the claims made by the Plaintiff in relation to her claim of reliance upon him to review the budgets before she submitted them in final form. The DFA employee denied that he had performed any review and/or approval of the Plaintiff's budget submissions. Plaintiff then claimed that if there were any errors the DFA employee would have sent it back to her. However, the employee denied this fact and with respect to FYI 14 the budget was revised

before he ever reviewed it and therefore did not perform any review of the budget request.

In addition, the Firm had another state employee who had put together numerous budget requests, spend a Saturday and review Plaintiff's work and the allegations made by the State. Plaintiff admittedly had never performed a budget request as complicated as the one she was required to perform and involving numerous other agencies. Plaintiff, because of her lack of experience on complex budgets, was of little assistance in explaining the alleged errors and the correct processes. Plaintiff referred the Firm to one particular DFA employee as someone she relied upon and who could explain to her the budget requests process. Plaintiff's self-serving statement that the Firm engaged in limited motions practice is both false and misleading.

7.     The Firm denies the allegations set forth in Plaintiff's Motion at paragraph # 7.

8.     Plaintiff's claim that Dr. Kliener was never designated as an Expert Witness in the Federal case is both false and misleading. Attached hereto as Exhibit Q are the Firm's initial disclosures which were sent to the State's counsel. [Exhibit Q, pg.4]. The Certificate of Service for the initial disclosures was filed on July 1, 2013. [*Doc.23*]. In accordance with the Court's Scheduling Order, [*Doc.21*] Plaintiff's expert report was not due until September 16, 2013. However, the court entered an Order staying the Federal case on September 13, 2013. [*Doc.25*]. The Order provided that the "case is hereby stayed until <u>an Order from the State Personnel Office has been entered in Plaintiff's appeal</u>." [*Id.*]. The Firm was not required to provide an Expert Report until the stay was lifted and a new scheduling Order was entered by the Court. On June 23, 2014, a Status Report was filed [*Doc.26*] by the Firm and noting that he had problems reaching Defendants' counsel(s) and the Status Report was originally due on June 1, 2014.  The Firm requested that the Court "immediately lift the STAY". [*Id.*]. That same day, Mr. Chris Saucedo filed his entry of appearance in the Federal case. On June 26, 2014, the Court scheduled

a Status Conference on July 8, 2014. [*Doc.29*]. On July 10, 2014, the Court entered an Order lifting the Stay and setting Plaintiff's Expert's deadline for October 6, 2014. The Order granting the Firm's withdrawal was entered on August 14, 2014. [*Doc.34*].  Therefore, in light of the fact that the Firm's Initial Disclosures identified Dr. Kliener as the Expert Witness and given that his report was not due until October 6, 2014, it is both false and misleading for Plaintiff to make the claim that the Firm did not disclose Dr. Kliener as an Expert Witness.

The Firm retained Dr. Kliener on March 21, 2013. The Firm, as noted in the letter to Dr. Kliener included copies of documents in the SPO case and therefore was seeking his opinion on the subject matter of the SPO case. Dr. Kliener's opinions related to the handling of Plaintiff's termination from an HR perspective. [Exhibit R]. However, the focus of the State's just cause defense resulted in the Firm refocusing the case strategy on the alleged budget request errors, which Dr. Kliener held no particular expertise. However, the firm continued to consult with Dr. Kliener regarding the HR issues in both the SPO and Federal case, which in the SPO became secondary. Dr. Kliener's expertise was more important in connection with the claims made in her Complaint therefore the Firm disclosed him in the Rule 26, Initial Disclosures. [Exhibit Q].

The Firm admits that it made a billing error related to Dr. Kleiner.  Dr. Kleiner was paid a retainer of $1,000 [Exhibits HH, ¶ # 3]. The Firm's paralegal admits that she incorrectly included $1,500 which was the amount of an additional retainer which had been discussed with Dr. Kleiner on or about September 23, 2013 when both she and Mr. Thompkins visited with Dr. Kleiner at his residence in California. [Exhibit II, pg.1, ¶ 5].

9.     The Firm denies the allegations set forth at paragraph # 9 of Plaintiff's motion. Plaintiff falsely states that "all times related to the settlement of the SPO matter, Sutana disagreed with the distribution of the settlement proceeds … Sutana relied on the representations

of Thompkins that the SPO fees would be paid out of the federal litigation." [*Doc.114,* pg.4, ¶ # 9]. However, as noted above, Plaintiff requested that the SPO case be handled separately from the Federal case and the Firm entered into an hourly agreement with Plaintiff for the SPO case. [Exhibit C]. When the Firm offered to collect its attorney fees in the SPO case after the Federal case was settled, Plaintiff agreed to this arrangement via e-mail on January 21, 2013 [Exhibit F]. Plaintiff expressly requested that the Firm "revised [the] contract". [*Id.*]. However, when the Firm sent Plaintiff the amended engagement letter [Exhibit D] Plaintiff changed her mind, refused to sign the amended engagement letter, as she stated that she wanted the SPO case to be resolved under the original signed hourly agreement. Plaintiff refused to sign the amended fee agreement and, thereafter, made no payments on the outstanding fees or any additional attorney fees.  Plaintiff was in breach of the written fee agreement while the Firm worked from January 2013 to June 2014 without any payment from Plaintiff.

Plaintiff cannot have it both ways, she agreed to an arrangement which she requested the contract be put in writing. However, she refused to sign the agreement and changed her mind about the Firm collecting its fees at the conclusion of the Federal case. Now, Plaintiff claims that she relied upon an agreement, which she both changed her mind about and refused to sign. This argument should be dismissed out of hand.

On May 31, 2014, before the Settlement was finalized, Plaintiff mentioned that she spoke with "Nathan", her fiancée, and came to the conclusion that the settlement offer "it may be the best we can do." [Exhibit S]. Because of Plaintiff's Bio-Polar issues and abusive e-mails, she had her fiancée act as a go between with the Firm and her. On June 14, 2014, the Firm had a telephone call in which Plaintiff and her fiancée participated. [Exhibit Y, pg.2, e-mail dated 6/14/2014]. Nathan requested that the Firm "send an email, just recapping our telephone

conversation. [*Id.*]. In direct response to Nathan's e-mail, the Firm outlined that "[t]he balance of our attorney fees will come out of the Federal lawsuit settlement or award." [*Id.* pg.1]. After the telephone conference and e-mail exchanges, Plaintiff agreed to the distribution of the attorney fees. Therefore, Plaintiff's allegation that she protested the attorney's fee distribution "at all times" is both false and misleading.

Another misleading allegation is that Plaintiff claims the SPO process involved only "a day's worth of depositions and no hearing".  This is blatantly false and misleading as the documents which have been presented in this Response so far, and which are not the complete record of the case, occurred from September 2012 to June 2014. The case was heavily litigated for close to two years. Plaintiff's version of facts are not only self-serving, but are blatantly false.

10.     Plaintiff admits that the check was made out to both Plaintiff and the Firm. However, the Firm explained to Ms. Sutana that the Firm would deposit the Settlement Check into the Firm's trust account and then make the distributions to the firm. It was clear, since the check was for $50,000 that she would not be getting any of the proceeds but would be getting the back pay for the balance of June 2014 which was set forth in the settlement agreement.    During the June 14, 2014, telephone with Plaintiff and her fiancée both agreed to this process since the full amount was going to the Firm and would be used to pay for outstanding costs incurred by the Firm. Plaintiff was provided with a copy of the Settlement check which exactly the amount which was stated in the Settlement agreement. Plaintiff cannot demonstrate that she has suffered any harm and is merely grandstanding once again on her reversal of the agreement we reached and regarding the Firm's payment of attorney fees.

11.     The Firm denies the allegations set forth in paragraph 11 of her Motion.  This is another example of Plaintiff's attempt to grandstand. On August 23, 2013, Plaintiff writes,

"Woo-hoo you are kicking ass!" [Exhibit KK]. However, Plaintiff's Bi-Polar mode swings would every time circumvent her moments of gratitude. On March 25, 2014, Plaintiff put together a demand letter in the SPO case and sent it to opposing counsel and Plaintiff was sent a copy of the demand letter. [Exhibit Z]. Prior to the demand letter, the parties had set-up a settlement conference for April 2, 2014. [Exhibit AA]. On March 29, 2014, the Firm wrote a position statement for the settlement conference in the SPO case and Plaintiff was sent a copy of the position statement. [*Id.*]. The case did not settle and on April 21, 2014, Plaintiff wrote that she "decided to look for another legal counsel for the Federal suit." [Exhibit BB]. Plaintiff then states, "[t]he SPO case is part of the lawsuit according to everyone else I've talked to and not a separate case." [*Id.*]. This e-mail contradicts Plaintiff request to have the Firm separate out the two different matters and her refusal to sign the amended engagement letter which she specifically requested.

On May 20, 2014, Plaintiff writes, that she is "I'm not going to wait until July or August for you guys to do what I've been paying you to do paying you to do." [Exhibit CC]. In this same e-mail, Plaintiff fired the firm and wrote, "[n]ow you both can step out of the SPO case." [*Id.*]. As with many of Plaintiff's e-mail it was another threat. Also, this is another contradiction in Plaintiff's allegations. Plaintiff was sent an invoice in January 2013, and which she acknowledges in Exhibit H that she owed $3,142.19. Yet since December of 2012, Plaintiff had paid the firm nothing for services which she knew were being provided to her. Therefore, if Plaintiff truly felt deceived, ignored and abandoned during the entire SPO process she never, other than making threats only to retract them, fired the Firm and she continued to use the Firm's services. Another problem the Firm was having with Plaintiff her continued e-mail threats to fire the firm and then contacting the State's counsel. At 12:43 p.m. she sent an e-mail to the State's

counsel Chris Saucedo. [Exhibit PP].

On April 21, 2014, Plaintiff threatened, "I have decided to look for another legal counsel for the Federal suit." [Exhibit DD]. However, she when the Firm withdrew from the Federal lawsuit because of Plaintiff's abusive e-mails and unsubstantiated complaint to the Disciplinary Board, she later in her motion claims the withdrawal was improper. This is yet again another contradiction in Plaintiff's allegations and the actual facts of the case. On May 20, 2014, Plaintiff wrote, "[c]an you please get started in the suit? I talked to a retired judge and she said at this point everything (SPO) will start from the beginning." [Exhibit JJ]. This contradicts Plaintiff's allegations in her motion that the cases overlap and they require the same facts and documentation.

The Firm admits that it filed an Amendment to Plaintiff's Complaint after the Firm discovered a possible claim through discovery and in speaking with witnesses in the case. The Firm spent considerable time tracking down the claims through witnesses and speaking with people as far as Las Cruces, New Mexico who were leads on the facts regarding the Whistleblower claim.

12.     The Firm denies the allegations set forth in paragraph # 12 of Plaintiff's Motion. Counsel for the Defendant suggested a stay of the Federal proceedings because we had full blown discovery taking place in the SPO case and both counsels and the Court recognized that the Federal case might be resolved or expedited after the SPO case was resolved. The e-mails upon which Plaintiff relies fail to demonstrate that the Firm coerced the Plaintiff. In fact, on May 31, 2014, after speaking with her fiancée, Plaintiff wrote, "[a]fter speaking with Nathan I did recognize that it may be the best we can do." [Exhibit T]. To try and turn the discussions and agreement into coercion is blatantly false and misleading.

The Firm explained to the Plaintiff on July 12, 2013, that the State, pursuant to the SPO rules, is entitled to an offset for the earnings and unemployment compensation she received during the period cover by the back pay award against the back pay due." [Exhibit FF]. The facts, explained to Plaintiff, in which she did not dispute is that she gained employment in a position in which she was paid significantly more money than she earned while she was employed with the State.  Despite our demands for back pay, Plaintiff in reality did not have a back pay claim and this would certainly come out at the SPO hearing. Once this was explained to both Plaintiff and her fiancée, Plaintiff accepted the settlement offer. To claim that she was coerced is a blatant lie.

13.     The Firm admits that that Judge Hayes lifted the stay in the Federal case on July 10, 2014. [*Doc.30*].

14.     The Firm admits that it filed a Motion to Withdraw. However, it was after Plaintiff wrote to the Firm stating that she was going to hire other counsel, after many abusive e-mails to the Firm's office and after Plaintiff filed a Disciplinary Board complaint, which was dismissed. The Motion was not based upon Plaintiff's alleged disappointment with the settlement but based upon her actions well before the settlement was reached and after she filed a Disciplinary Board Complaint. The basis and facts are set forth in the Firm's e-mail date July 14, 2014, in which the Firm writes, "… throughout the course of the SPO case and with your latest e-mails you are treating us (the Firm) as if we are your enemies. The e-mails have been very offensive and, in my opinion, unnecessary. Given the type of conduct that has occurred over the course of the SPO case and in the Federal case, I have decided to end our relationship." [Exhibit EE]. Plaintiff's attempt to mischaracterize the true facts should fail and the Court should consider Plaintiff's e-mails and contrary representation that on April 21, 2014, she was going to

hire another Firm for the Federal case, clearly demonstrates her duplicitous actions. [Exhibit BB].

15.     The Firm does not dispute the allegation that Plaintiff retained him for the Federal lawsuit as alleged in paragraph # 15 of her Motion.

16.     The Firm denies the allegations set forth in both paragraphs # 16 of Plaintiff's Motion. Plaintiff states that the Firm did nothing more than fulfill the duties related to pre-discovery matters. However, Plaintiff fails disclose the pre-litigation research on the initial 27 page Complaint filed in the First Judicial District Court. As noted above the Complaint was forced to be filed within 90 days of Plaintiff acting as her own attorney in the EEOC case and demanding a right to sue letter from the EEOC. The Firm spent a considerable amount of time verifying the facts and confirming with Plaintiff the accuracy of the Complaint. The Firm researched an alleged violations of the American with Disability Acts, New Mexico's Human Rights Act, Retaliation, Hostile Work Environment, FMLA Interference & Retaliation, Breach of Contract, Title VII, 42 U.S.C. § 1983 Discrimination, Freedom of Speech, Retaliatory Discharge, and the First Amendment. The Firm consulted with Dr. Kleiner regarding the drafted Complaint before filing.  After having conducted research, the Firm had spoken with several witnesses and discovered the Whistle Blower claims which Plaintiff had not revealed to the Firm.  The Firm then researched the Whistle Blower statutes and amended the Complaint to include this claim.  When the case was removed, the Firm continued its research and filed a Third Amended Complaint. The Firm reviewed discovery received from the Defendants and forwarded to the client.  The invoice details the actions taken by the Firm in Plaintiff's case and it is disingenuous to alleged that the Firm did nothing more than fulfill pre-discovery duties, whatever that term means.

Since Plaintiff has devalued the services provided to the Plaintiff, then during the course of Plaintiff's new attorney handling the case, the Firm was contacted an asked to reduce the amount of its invoice, which the Firm did reduce by $4,000 and then subsequently reduced it to $15,000 all of which Plaintiff rejected. Plaintiff's new counsel asked the Firm to provide assistance with their pre-settlement discussion and the settlement agreement in the SPO case. On May 6, 2015, Mr. Mozes sent an e-mail exclaiming that the Defendants had filed 9 motions for summary judgment and need the Firm's assistance. [Exhibit V, Exhibit LL and Exhibit MM]. The Firm agreed to assist without charge to the Plaintiff and began coordinating the request with certain witnesses and provided discussion about the settlement agreement in the SPO case. To call the Firm's contribution and assistance nothing more than fulfilling pre-discovery duties is again disingenuous.

Plaintiff falsely stated that the Firm did not identify Dr. Kleiner as an Expert Witness in the Federal case and Dr. Kleiner provided nothing to the Federal case. The Firm has presented evidence that refutes this false statement as Dr. Kleiner was disclosed in the Rule 26 Initial Disclosures. Second, Plaintiff failed to acknowledge Dr. Klein's assistance to the Firm's in its' extensive pre-litigation investigation into all of Plaintiff's claims including the last claim added for being a whistle-blower. Dr. Kleiner's assistance helped the Firm research and assert many of the claims, including Free Speech, which were asserted on Plaintiff's behalf in the civil lawsuit. [Exhibit HH, ¶¶ 4-5]. Lastly, the Firm as set forth above, demonstrated that there was no "significant overlap" and Plaintiff's e-mail dated May 20, 2014, demonstrates Plaintiff's contradiction when she wrote, "[c]an you please get started in the suit? I talked to a retired judge and she said at this point everything (SPO) will start from the beginning." [Exhibit JJ]. The opinions in the e-mail directly contradict Plaintiff's allegations.

Plaintiff's alleged simplification of the process and alleged overbilling ignores Rule 16-105 (A) (1) provisions that takes into consideration: "(1) the <u>time and labor required</u>, the novelty and <u>difficulty of the questions involved</u>, and the <u>skill requisite to perform the legal service properly</u>. As noted in Exhibit K, the SPO case involved Plaintiff's performance in putting together certain budget requests and budgets for the Fiscal Years, 2013 and 2014. [Exhibit K, pg.6, ¶¶s 2-6]. The Firm, as argued above, has provided the Court with sufficient documents and pleadings that demonstrate the extensive time and labor required to defend the difficult question along with the skill required for the just cause termination based upon critical errors in Plaintiff's budget work.

Another false statement from Plaintiff is that Dr. Kleiner stated that the Firm never traveled to California to discuss the case with him.  However, both Dr. Kleiner's Affidavit [Exhibit HH, pg.2, ¶ 6] and the para-legal's Affidavit [Exhibit II, pg.1, ¶ 3] exposes Plaintiff's false and misleading statements.

Plaintiff's false and misleading statements regarding "cut-and-past" is easily expose when the Court reviews both the JSR with the Initial Disclosures.  Equally as disturbing it the allegation that the JSR and Initial Disclosures were made after the case was stayed.  Again, by simply looking at the dates of the documents and when the stay went into effect, Plaintiff's false and misleading statements are again proven.

Plaintiff attempts to make a point that the Expert provided no report.  However, Plaintiff ignores that fact that the Expert's report was not due until October 2014 and because of the stay no discovery had been conducted in order for Dr. Kleiner to complete his report.  Therefore, this argument should be dismissed out of hand.

17.     The Firm denies the allegations in paragraph # 17 of Plaintiff's Motion.  Plaintiff

simply fails to correctly read the invoice.  The invoice shows that the paralegal's time is 1.1 and was billed at $75.00.   The figure referred to by Plaintiff is both the paralegal time and the expenses together. For Plaintiff to claim to be have significant "budget" experience its' difficult to understand how she could simply not see that the figures are added together and expenses are separate from the paralegal's hourly fees.

18.     The Firm admits that the fees rendered in the case on the invoice total $34,497.00. However, when Plaintiff's current counsel entered the case the Firm agreed to reduce its fees to $20,000.00. [Exhibit NN]. On May 26, 2014, the Firm agreed to reduce its invoice to $15,000.00. [Exhibit OO]. Plaintiff rejected all of the Firm's reasonable offers.

19.     The Firm is without sufficient information and belief to determine the truth of Plaintiff's allegations paragraph #19. However, the facts stated therein contradict argument alleged by Plaintiff in the SPO case.  The Firm's handling of the SPO case took considerably more time that Mr. Mozes' substitution as counsel in the instant case. He took as many depositions as the Firm, replied to Motion to Dismiss as did the Firm, and he did not reply to the nine (9) motions for summary judgement and did not go to trial. Yet in argument the billing in the SPO case Plaintiff argues that because it the SPO case did not go to trial, the Firm's invoice should be diminished on this basis. Plaintiff cannot have it both ways.  Even in making its conclusory arguments, Plaintiff provides no evidence in support of her argument.

20.     The Firm is without sufficient information and belief to determine the truth of Plaintiff's allegations paragraph #20. However, Plaintiff neglects to mention that her current counsel spent time calling the Firm and requesting the Firm's assistance in preparing for the settlement conference and providing opinions and law on the SPO settlement agreement.

21.     The Firm admits that there were several discussions between Plaintiff's current

counsel and the Firm. However, when Plaintiff's current counsel entered the case the Firm agreed to reduce its fees to $20,000.00. [Exhibit NN].  On May 26, 2014, the Firm agreed to reduce its invoice to $15,000.00. [Exhibit OO]. Plaintiff rejected all of the Firm's reasonable offers.

22.     The Firm admits that it filed an attorney's charging lien [*Doc.113*].  The charging lien does not specify an amount as the Firm was hopeful that settlement negotiations would prove beneficial.

23.     The Firm admits a dispute exist over the fees and services rendered in the instant case.  However, the Firm disputes that the Plaintiff disputed the fees in the SPO case and improperly raises them for the first time in her dispute of the charging lien in the instant case.

24.     The Firm admits that on August 12, 2014, it filed a Motion to Withdraw. However, the motion was preceded by the Plaintiff on April 21, 2014, advising the firm that "I have decided to look for another legal counsel for the Federal suit." [Exhibit DD]. In addition to that Plaintiff had refused to sign the amended fee agreement which she had specifically requested.  Finally, prior to August 12, 2014, Plaintiff filed a Complaint with the New Mexico State Disciplinary Board, which was dismissed.  Therefore, Plaintiff, as set forth in the Motion took actions which required the firm to withdraw from her case.

### III.     LEGAL ARGUMENTS

#### A.  The Firm's Fee Agreement Is Complaint With NMRA, Rule 16-105 (C)

Plaintiff's first argument is that the September 11, 2012 fee agreement violates Rule 16-105(A) because it is not reasonable. [*Doc.114*, pg.8, ¶ II.A].  However, Plaintiff ignores that Rule 16-105 (A) (1) provides that the reasonableness of the fee takes into consideration: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill

requisite to perform the legal service properly. As noted in Exhibit K, the SPO case involved

Plaintiff's performance in putting together certain budget requests and budgets for the Fiscal

Years, 2013 and 2014. [Exhibit K, pg.6, ¶¶s 2-6]. As noted above, the DFA's website lists forty-

five forms related to the "Budget Preparation System" and "Performance Based Budget

System".[4]   The civil lawsuit Complaint contained allegations of alleged violations of the

American with Disability Acts, New Mexico's Human Rights Act, Retaliation, Hostile Work

Environment, FMLA Interference & Retaliation, Breach of Contract, Title VII, 42 U.S.C. § 1983

Discrimination, Freedom of Speech, Retaliatory Discharge, and the First Amendment.

The Complaint is not the garden variety Personal Injury case and is fact specific given the

related burdens of proof for each claim Federal and State law claims.  The Whistle Blower

protection act is a recent development in New Mexico law and therefore presents a difficult area

of the law to navigate. Other factors that were also at play and considered under Rule 16-105 (A)

include the "(3) fee customarily charged in the locality for similar legal services", the Firm's

billing of $300 an hour was approved in Federal Civil Rights case just recently. The ":(4) amount

involved and the results obtained", the Firm negotiated a settlement in the SPO case which

allowed the Plaintiff to add to her damages the amount Plaintiff would have received because of

the Defendants' failure to re-employ her as required in the SPO rules. The "(5) limitations

imposed by the client or by the circumstances", as noted above, Plaintiff acting as her own

counsel, pre-maturely requested a right to sue letter which required that she file a civil Complaint

within 90 days, despite her counsel's advice to the contrary. The "(6) nature and length of the

professional relationship with the client". The Firm was handling Plaintiff's SPO case when she

demanded that the Firm separate out the two matters.  After entering into an agreement dated

---

[4] The State's Department of Finance and Administration's ("DFA") forms are located at
http://www.budget.nmdfa.state.nm.us

September 12, 2012, the Plaintiff on April 21, 2014, almost two year later, advised the firm that "I have decided to look for another legal counsel for the Federal suit." [Exhibit DD]. The "(7) the experience, reputation, and ability of the lawyer preforming the services." The Firm's counsel has been practicing for over 25 years the Firm's attorney has been handling civil rights cases for over 15 years and has been approved for attorney fees in both State and Federal Courts at the rate of $300.00 per hour. Finally, the last factor is "(8) whether the fee is fixed or contingent." In this case the September 12, 2012 agreement was a "hybrid" including both contingency and hourly fees. Plaintiff's conclusory statements regarding 16-105 (A) failed to recognized the above-referenced factors which favor the reasonableness of the Firm's fees.

Plaintiff next alleges that Rule 16-105 (C) was violated because the fee agreement did not state the method by which the fee is to be determined. However, plainly on its face the fee agreement provides for the hourly rates that the Firm would be charging and that the types of costs that Plaintiff is responsible for. Further, the fee agreement provided that "[t]he fees and costs relating to this matter are not predictable. Accordingly, we have made no commitment to you concerning the maximum fees and costs that will be necessary to resolve or complete this matter." While the Plaintiff attempts to call it only a contingency fee agreement the express language states that it is a hybrid agreement. Therefore, Plaintiff's argument on this point and regarding the hourly rates charged should be dismissed as the fee agreement does not violate Rule 16-105 (A) or (C).

### B.  The Firm's Fee Agreement Is Enforceable

Plaintiff's next, argues in error, that the hourly fee agreement is not enforceable. However, as argued above, the Firm's fee agreement sets forth the both the hourly charges and the costs that may be incurred in the litigation. The Firm's invoice charges the hourly rates which

were applicable to the service provided to the Plaintiff and therefore the argument is misplaced. The first case relied upon by Plaintiff involved a contingency fee agreement without an hourly billing provision as present in the instant case. The Court placed $569,593.51 in reserve for the Firm's contingency fee claim for attorney fees. The Court's analysis did not involve an claim for the hourly fees which the Plaintiff in the instant case has contracted. Therefore, *Moffat v. Branch*, 132 N.M. 412 is not controlling on the issue of an hourly fee agreement and charges submitted for work performed on an hourly basis.

### C.  The An Hourly Fee Agreement Is Not Dependent Upon A Recovery Of Funds

First, Plaintiff's reliance upon *Moffat v. Branch*, 132 N.M. 412 is misplaced as the firm's fee agreement provides for services rendered on an hourly basis and expressly sets forth the amounts to be charged. Again, the hourly fee agreement portion provides that "[t]he fees and costs relating to this matter are not predictable. Accordingly, we have made no commitment to you concerning the maximum fees and costs that will be necessary to resolve or complete this matter."

In New Mexico, the attorney's charging lien "has its origin in the common law, and is governed by equitable principles." *Cherpelis v. Cherpelis*, 959 P.2d 973, 975, 125 N.M. 248 (N.M. App., 1998). The charging lien accrues from the moment an attorney commences services. *In re Marriage of Berkland*, 762 P.2d 779 (Colo. App. 1988). The attorney's charging lien is intended "to protect attorneys against dishonest clients, who, utilizing the services of the attorney to establish and enable them to enforce their claims against their debtors, sought to evade payment for the services which enabled them to recover their demand." *Cherpelis,* 959 P.2d at 975-76. However, if the trial court determines that the agreement is ambiguous, and the contract could be understood to include payment of attorney fees upon a judgment, then <u>the trial court</u>

will balance the equities between the attorney's charging lien and the set-off." Id. at 977. (Emphasis ours).  Using these equitable principles, Plaintiff should not prevail on her motion and deny the Firm payment under the hourly provisions of the fee agreement.

**D.      Based Upon The Factor Set Forth In Rule 16-105 (A)
The Firm's Fees Are Not Excessive**

Plaintiff's last argument is a re-argument of its first argument regarding the reasonableness of the Firm's Fees under Rule 16-105 (A).  Plaintiff then attempts to boot-strap her argument with the SPO case, which is not a part of the Firm's charging lien which as indicated above contain numerous false and misleading statements. As argued above, as presented above, the Plaintiff fails to address factors (1), (3), (5), (6), (7) and (8) of Rule 16-105 (A) and therefore, Plaintiff's arguments should be dismissed.  The equitable principles in this case should result in the dismissal of Plaintiff's motion and an award of the Firm's fees even at the last offer of $15,000.

**CONCLUSION**

Wherefore, the Firm respectfully requests that this Court under its equitable powers dismiss Plaintiff's motion and award the Firm $15,000 in hourly attorney fees.

**RESPECTFULLY SUBMITTED:**

/s/ Nathaniel V. Thompkins
Nathaniel V. Thompkins
NEW MEXICO FIRM, LLC
103 St. Francis Drive, Unit A
Santa Fe, NM 87501
Phone: (505) 988-9750

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the forgoing Notice of Charging Lien was either served via the New Mexico Federal District Court's electronic filing system, mailed via U.S. mail postage pre-paid, and/or e-mailed to the below listed individuals on this the 25th of June, 2015.

Michael E. Mozes
Law Offices of Michael E Mozes PC
5732 Osuna Rd. NE
Albuquerque, NM 87109
505-880-1200
Fax: 505-881-2444
Email: Michael@mozeslawoffice.com
*Attorney for Plaintiff*

Christopher T Saucedo
Saucedo Chavez, P.C.
6565 Americas Parkway NE
Suite 920
Albuquerque, NM 87110
505-338-3945
Fax: 505-338-3950
csaucedo@saucedochavez.com
*Attorney for Defendants*

/s/ Nathaniel V. Thompkins
Nathaniel V. Thompkins