**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

Case No.: 1:13-cv-00210-SMV-RHS

DANNI SUTANA,

      Plaintiff,

vs.

STATE OF NEW MEXICO, ECONOMIC DEVELOPMENT DEPARTMENT;
JONATHAN ("JON") BARELA, individually and in his official capacity;
BARBARA G. BRAZIL, individually and in her official capacity;
WADE JACKSON, individually and in his official capacity;

      Defendants.

**THIRD AMENDED COMPLAINT**

NOW COMES the Plaintiff, DANNI SUTANA, by and through her attorneys, the New Mexico Firm, LLC, [Nathaniel V. Thompkins] and for her Second Amended Complaint states as follows:

**I.    THE PARTIES and JURISDICTION**

1.    Plaintiff, DANNI SUTANA ("Sutana"), is an individual and has resided at 6600 Sahchu Street, Cochiti Lake, County of Sandoval, State of New Mexico at all relevant times to this Complaint.

2.    All the facts and circumstances set forth in Sutana's Complaint occurred within the City of Santa Fe, County of Santa Fe, State of New Mexico.

3.    Defendant, New Mexico Economic Development Department [hereinafter "EDD"] is, a duly organized governmental department of the State of New Mexico, constituted in accordance with the laws, statutes and regulations of the State of New Mexico. EDD is amendable to suit as a

Exhibit L

governmental entity under the federal and state statutes which Sutana relies upon in bringing this lawsuit.

4.   Defendant, Jonathan ("Jon") Barela, is, upon information and belief, a resident of the City of Albuquerque, County of Bernalillo, State of New Mexico.  Defendant Barela is sued in his official capacity.

5.   Defendant, Barbara G. Brazil, is, upon information and belief, a resident of the, City of Albuquerque, County of Bernalillo, State of New Mexico. Defendant Brazil is sued individually and in her official capacity.

6.   Defendant, Wade Jackson, is, upon information and belief, a resident of the City of Albuquerque, County of Bernalillo, State of New Mexico. Defendant Barela is sued individually and in his official capacity.

## II.   FACTUAL ALLEGATIONS

7.   Sutana hereby adopts and incorporates by reference paragraphs 1 through 6 as set forth above.

8.   On June 15, 2012, Sutana filed a Charge of Discrimination with the Equal Opportunity Commission ("EEOC"), alleging that she had been discriminated against by the EDD because of her disability, "Bi-Polar and Hearing Loss". [Agency Charge No. 543-2012-01154] (A copy of said notice is attached hereto and incorporated herein by reference as Exhibit A.)

9.   In March 2012, A. Kurt Saenz (hereinafter "Saenz"), Administrative Services Division Director ("ASDD") provided Sutana with a spreadsheet from the Legislative Finance Committee ("LFC") and requested that Sutana

# Exhibit L

investigate the New Mexico Investment Tax Credit ("NMITC") program which was the subject of the data on the spreadsheet.

10.     When Sutana could not locate financial information or data on the NMITC on the SHARE system she asked Brent Eastwood about the spreadsheet and program.  Brent Eastwood provided Sutana with a copy of the Whistle Blower's Act and requested that both she and Saenz sign it.

11.     Sutana then reported her findings or lack of ability to find financial data on the SHARE system to Saenz.

12.     In the latter part of June or early part of July 2012, Sutana notified the Attorney General's Office about the NMITC issue and about certain procurement code violations that occurred in EDD.

13.     Defendant, Barela and Defendant, Brazil, became aware that Brent Eastwood had both Sutana and Saenz sign copies of the Whistle Blower Act shortly after they (Sutana and Saenz) had signed them.

14.     Within a relatively short period of time following the signing of the Whistle Blower Act, Brent Eastwood, Kurt Saenz and Sutana were terminated form the employee of the State of New Mexico.

15.     On July 25, 2012, Sutana filed an Amended Charge of retaliation and hostile work environment by the EDD since her filing of a charge of discrimination. (A copy of said notice is attached hereto and incorporated herein by reference as Exhibit B.)

16.     On September 12, 2012, Sutana filed a second Charge of Discrimination with the EEOC alleging that she had been discriminated against

# Exhibit L

by the EDD because of her "Race/National Origin". [Agency Charge No. 543-2012-01425] (A copy of said notice is attached hereto and incorporated herein by reference as Exhibit C.)

17.   On October 4, 2012, the EEOC issued Sutana a Notice of Right to Sue ("NRTS") stating that the EEOC was unable to conclude whether violations of the Americans with Disability Act ("ADA") had occurred. (A copy of said Notice is attached hereto and incorporated herein by reference as Exhibit D) [Agency Charge No. 543-2012-01154]  On October 16, 2012, the New Mexico Human Rights Division issued an Order of Non-Determination for EEOC Case No. 543-2012-01154. (A copy of said Notice is attached hereto and incorporated herein by reference as Exhibit E)

18.   On October 26, 2012, Sutana filed an Amended Charge of retaliation for her wrongful termination on October 5, 2012, and related to the charge of retaliation. (A copy of said Amended Charge is attached hereto and incorporated herein by reference as Exhibit F)

19.   On November 30, 2012, the EEOC issued Sutana a Notice of Right to Sue ("NRTS") stating that the EEOC was unable to conclude whether violations of the Americans with Disability Act ("ADA") had occurred. [Agency Charge No. 543-2012-01425] (A copy of said Notice is attached hereto and incorporated herein by reference as Exhibit G)

20.   Sutana has exhausted her administrative remedied with respect to her ADA and New Mexico Human Rights Act ("NMHRA"), N.M.S.A. 1978, § 28-



Exhibit L

1-7 claims set forth herein and has complied with all conditions precedent to maintaining this action.

21.   This Complaint is filed within 90 days of Sutana's receipt of the NRTS and Order of non-determination.

22.   This Court has subject matter jurisdiction over Sutana's state and federal claims and personal jurisdiction over the parties.

23.   Venue is proper in this Court as to the facts and circumstances as well as the location of the Defendant employer all are in the County of Santa Fe, City of Santa Fe.   There is nothing in Sutana's claims under federal law that divests this Court of jurisdiction.

24.   In March 2011, Sutana was advised by Defendants, Barela, Brazil and Jackson, that the EDD budget, which she would be responsible for as the Finance Manager, was $6.8 million dollars.

25.   When Sutana began her employment with EDD as a Finance Manager she was required to work longer hours than expected because the actual budget was $148.3 million, which was 95% more than she was advised.

26.   On June 20, 2011, Sutana wrote to Defendant Brazil and advised her that "I have maxed out of my comp time allowed a month ago.   I've attempted to flex my schedule but I end up working from home. I have been *writing off 6-10 hours per week for the past month*. In a prior e-mail which was Carbon Copied to Defendants Brazil and Jackson, Sutana advised of a problem with the Spaceport's $22,791,897.61 budget and that she was working on



cleaning up the books and "there is nobody else trained to do this ... but me" (Sutana).

27.    As a direct result of the size of the actual budget ($148.3 million), Sutana had to work long hours beyond the normal work day hours.  Between May and June 2011, Sutana had earned 72.5 hours of compensation time.  By September 2, 2011, Sutana had earned 152.5 hours of compensation time. Due to a lack of approval of some of the compensation time, Sutana lost 72.5 hours of compensation time.

28.    In April, 2011, shortly after she started working at the EDD, Sutana advised Saenz, ASDD, that she had a significant hearing loss and suffered from a Bi-Polar disorder. Upon information and belief, Saenz, ASDD, shared Sutana's conditions with Defendants Brazil and Jackson.

29.    On September 2, 2011, Sutana sent an e-mail to her immediate supervisor, Saenz, ASDD and Defendants, Barela, Brazil, Jackson. In Sutana's September 2, 2011, e-mail she voiced her concerns about the following:

(1) being in the position for 5 months and no defined roles and responsibilities;

(2) budget going from $6.8 to $148.3 million (95% increase);

(3) outline the position she accepted and the one that she was actually working;

(4) she had worked enough time to earn 252.75 hours of comp time, 72.5 of which she lost.

(5) Ms. Sutana stated that being in an undefined position that it allows for mistreatment, incorrect expectations all of which she had been experiencing since she became employed with EDD. Ms. Sutana explained the difficult position that she has been

# Exhibit L

placed in and which resulted in her being viewed by outside agencies as "a hinder".

(6) Ms. Sutana requested "Alternative Dispute Resolution" concern the issues raised in her e-mail.

30.    In September, Sutana advised Saenz, ASDD, that she had received information from Dolores Gonzales that Defendant Jackson was having an extra marital affair with another ASDD employee. Ms. Sutana reported the information to her immediate supervisor, Saenz, ASDD.  In turn, Saenz, ASDD, reported the information to the Defendant Jackson and disclosed the source of the information coming from Sutana.

31.    On September 19, 2011, Defendant Jackson responded to Ms. Sutana's e-mail and rather than address the issues in the e-mail, Mr. Jackson advises Sutana that her e-mail was to be treated as a "Formal Complaint".  Mr. Jackson closed with advising Ms. Sutana that EDD would issue a "Response" to her Complaint.

32.    Upon information and belief, Defendants Brazil and Jackson began to target Sutana because of her disclosed medical conditions and her knowledge of the affair that Defendant Jackson was involved in.

33.    On September 20, 2011, Defendant Jackson provided Saenz, ASDD, with EDD's Response to Ms. Sutana's e-mail.  EDD's Response list Saenz, ASDD, as the author and Defendant Jackson. However, Saenz, ASDD, never was questioned nor did he participate in drafting EDD's Response and he never authorized his name to be associated with EDD's Response which Defendant Jackson handed to him.



34.     Saenz, ASDD, advised Defendants, Barela, Brazil and Jackson that EDD's Response was "factually inaccurate and contains information that has simply been fabricated."   Saenz, ASDD, further advised Defendants, Barela, Brazil and Jackson, that the Response was the type of document that could get EDD into trouble.

35.     The State Personal Rules and Regulations, NMCA 1.7.6.13 provides for Alternative Dispute Resolution ("ADR") for matters such as those raised in Sutana's September 2, 2011, e-mail. However, Defendant Jackson's Response intentionally disregards the provisions of the State Personnel Rules and Regulations and is rather an attack on Sutana.

36.     In September 2011, Saenz, ASDD, received approval from the Defendant Barela to handle Sutana's September 2, 2011, e-mail informally and to schedule a meeting with Sutana, himself and the Defendants, Brazil and Jackson.  Saenz, ASDD, received the approval of the Defendant Barela to not make EDD's Response a part of Sutana's employee file.

37.     At the meeting between Sutana, Saenz, ASDD, and the Defendants, Brazil and Jackson, it was presented to Sutana that the meeting was to close some issues and that Sutana's e-mail was "not a formal complaint".  However, other than minimizing Sutana's concerns the Defendants refused to address any of the real issues set forth in Sutana's September 2, 2011 e-mail.

38.     After the meeting between Sutana, Saenz, ASDD, and the Defendants, Brazil and Jackson, Saenz, ASDD, received notice from Sutana

# Exhibit L

that the Defendant Jackson had placed EDD's Response in Sutana's employee file. Upon information and belief, Defendants Brazil and Jackson both participated in creating EDD's Response and both agreed to the inclusion of the Response in Sutana's employment file.

39.     On August 8, 2011, Defendant Brazil advised Sutana that after raises were approved for other employees that if she (Sutana) put in a request for a raise for herself and one other employee that she (Brazil) would approve them.

40.     On August 17, 2011, Sutana filled out a "Request for Human Resources Action" for an "In Pay Band Increase".  The form was approved by Saenz, ASD, while Defendant Brazil's approval was so noted on a post-it note forwarded to the Defendant Jackson. Saenz, ASDD, signed approval for Sutana's raise on the HR Form on August 26, 2011.

41.     In November 2011, Sutana, due to the long hours she was working and the hostile work environment began to experience serious medical problems which included, but were not limited to, depression and anxiety.

42.     In December 2011, Sutana requested permission to take vacation. While the request for vacation was granted, Sutana was called and sent e-mails by Saenz, ASDD, daily requesting that she return early from her vacation.

43.     On January 26, 2012, Saenz, ASDD, advised Sutana that her raise was pending a desk audit.  On March 8, 2012, Saenz, ASDD, advised Sutana that Defendant Brazil needed to sign off on Sutana's pay raise paperwork.

# Exhibit L

44.    On February 21, 2012, Sutana requested Mediation with Saenz, ASDD, and the Defendant Brazil.  An agreement was reached and signed by the Defendant Brazil and Sutana, however, the Defendant Brazil never abided by the agreement.

45.    In late February 2012, Sutana spoke with her immediate supervisor Saenz, ASDD, regarding her medical issues which included high anxiety, increased depression, vision issues, hair falling out, and stomach problems.  Sutana wanted to take leave under FMLA, however, Saenz, ASDD, discouraged Sutana from taking leave due to the large workload.

46.    In early March 2012, Saenz, ASDD, was removed from ASDD and Defendant Brazil became Sutana's immediate supervisor.

47.    On March 26, 2012, Defendant Jackson, refused to discuss Sutana's pay raise and dismissed Sutana's request to discuss any other issues.

48.    In April 2012, Sutana met with Defendant Barela to discuss her alleged performance issues.  Defendant Barela advised Sutana that he was not aware of any performance issues and that he was happy with Sutana's performance.

49.    On April 24, 2012, Sutana asked Defendant Jackson, via e-mail, what she needed to submit to Human Resources in order to request and get approved for medical leave under FMLA.  Defendant Jackson, EDD's "Human Resources Bureau Chief", mislead Sutana by telling her that all she need is a "… letter from the doctor will be fine."   Fortunately, Sutana, upon further inquiry she discovered that FMLA specific forms were required and must be

Exhibit L

completed in order to apply for, get approved for and take medical leave under FMLA.  Despite his titles as EDD's "General Counsel and Human Resources Bureau Chief", Defendant Jackson intentionally failed to provide Sutana with the necessary information and forms required for taking Family Medical Leave under FMLA.

50.    Sutana due to the hostile work environment, discriminatory treatment and harassment, filed a request for "Family and Medical Leave". Sutana obtained an "Employee's Serious Health Condition Medical Certification Statement from her medical doctor.  The doctor noted that "Patient is having severe anxiety causing panic attacks leading to black outs, daily dizziness, palpitations, nausea, insomnia, explosive diarrhea."  It was noted that the symptoms "… will impair any normal individual to perform his or her job competently.  The stress level Danni experiences at current work environment are detrimental to her health."

51.    On April 26, 2012, Defendant Brazil, filed the "Employer Response to Employee Request for FMLA".  It was approved due to Sutana's "… serious health condition that makes you unable to perform the essential functions of your job …".

52.    After Sutana disclosed her serious medical conditions, Defendant Brazil began to harass Sutana.  The Defendant Brazil on April 27, 2012, asked Sutana if she was suffering from Post-Traumatic Stress Disorder ("PTSD") because she came from Laos.

# Exhibit L

53.    Sutana began her medical leave on April 30, 2012 and was due to return to work on May 25, 2012.  However during the period of her medical leave Defendants Brazil and Jackson interfered with her leave by requiring that Sutana continue working during the period of her medical leave.  Sutana was required to answer e-mails, take telephone calls and work part-time on Tuesdays and Wednesdays, all during the period of her medical leave.  Due to the amount of work she was doing and required to do on medical leave, Sutana did not feel that she was actually on medical leave.

54.    After returning from medical leave the Defendant Brazil became progressively more hostile towards Sutana. This hostility included Defendant Brazil leaving Sutana out of EDD meetings. Sutana was then regulated to getting information and data she needed to perform her job from second hand sources. When Sutana questioned Defendant Brazil about the meetings and why she wasn't invited, Defendant Brazil simply did no answer Sutana's legitimate questions and continued to meet with Georgette behind closed doors.

55.    Post Sutana's medical leave, Defendant Brazil alleged that Sutana had failed to deposit ISO funds into the EDD accounts because another ASD employee, Georgette, could not find any revenues. Sutana refuted Defendant's accusations.

56.    On another occasion, in order to belittle Sutana in front of other State employees, Defendant Brazil asked Sutana if she eats "monkeys or dogs".

57.    On June 15, 2012, Sutana filed her EEOC Complaint against EDD alleging discrimination based upon her disability.  The Complaint's particulars

# Exhibit L

include the allegation that Sutana's "supervisor", which at the time was the Defendant Barbara Brazil, had harassed her and made insensitive comments regarding people with disabilities.

58.    On July 10, 2012, Defendant Jackson sent Sutana a Notice of Contemplated Personnel Action ("NCA".  The notice contained six (6) bullet points that included: (1) becoming involved in an issue with the New Mexico Board Authority's budget; (2) wasting Defendants' Brazil and Jackson time (half hour) in an attempt to resolve an issues; (3) a request for a follow-up meeting from Cathy Meyer of DFA's Central Payroll; (4) Ms. Chavez inquiry if a meeting had taken place; (5) Sutana's response being "rude and condescending" and allegations of "oral reprimands" from supervisors; and (6) Sutana's attitude creating a hostile work environment for co-workers.  While the NCA alleges "progressive discipline", it failed to set forth what instances there were of "progressive discipline" being instituted against Sutana.

59.    On July 11, 2012, Defendant Jackson issued to Sutana a second NCA in which EDD was considering taking personnel action, including termination, for violating Governor Martinez's e-mail policy in which Sutana "copied" her personal e-mail account on a department e-mail.

60.    On July 20, 2012, Sutana submitted her Response to the July 10, 2012, NCA and to the July 11, 2012, NCA.  In regards to the July 10th NCA, Sutana refuted the allegations and pointed out the misstated claim that EDD had taken progressive disciplinary steps against her.  In regards to the July 11, 2012, NCA Sutana advised Defendant Jackson that the Governor's e-mail

# Exhibit L

policy had never been provided to her.  Further, Sutana responded that the NCA comes three weeks after she filed her EEOC Complaint.

61.   On July 25, 2012, Sutana filed an Amended Charge of Discrimination in which she alleges "retaliation" and being "written up for allegedly creating a hostile work environment …".

62.   On July 31, 2012, Defendant Jackson issued a Notice to Sutana that EDD was withdrawing the NCA dated July 10, 2012, regarding her "attitude toward and communications with your co-workers".  At the same time Defendant Jackson issued a Notice of Final Personnel Action ("NFA") related to the July 11th NCA and concerning the Governor's e-mails policy.  The NFA stated that the "… Department takes no personnel action against you …".

63.   On September 7, 2012, Defendants Barela and Jackson instructed Sutana to leave the EDD premises with her personal property.  Simultaneously, Defendants Barela and Jackson issued to Sutana a NCA and Notice of Disciplinary Action ("NDA").  Defendants advise Sutana that an investigation was pending and she was placed on administrative leave.  Sutana was ordered to have no contact with any EDD employees or any other employees that she had worked with for the State of New Mexico.

64.   On September 10, 2012, while Sutana was on administrative leave she was advised that the September 7, 2012, NCA and NDA were both withdrawn.

65.   On September 12, 2012, Sutana filed a second EEOC Complaint alleging discrimination based upon "National Origin".  In the particulars,

# Exhibit L

Sutana states that she has been subjected to negative comments about her Race/National Origin and that "Deputy Secretary Brazil asked her if she 'ate dogs and monkeys' ".  Further, Sutana stated that Defendant Brazil had asked her if she had PTSD because she is from Laos.  Sutana alleged a hostile work environment existed due to the acts of the Defendants.

66.    On September 19, 2012, Defendant Barela issued NCA to Sutana alleging incompetence in her ability to perform her job as the Finance Manager for EDD.

67.    On October 2, 2012, Sutana timely filed her Response to the NCA in which she refuted all the charges and raised her counterclaims of discrimination, retaliation and hostile work environment.

68.    On October 3, 2012, Defendant Barela issued a NFA in which Sutana's employment was terminated.

69.    On October 29, 2012, Sutana timely filed a Notice of Appeal of the NFA with the State Personnel Board.  The matter is being re-scheduled for a hearing sometime in May of 2013.

## COUNT I

### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT "REGARDED AS" DISABLED
### and
### NEW MEXICO HUMAN RIGHTS ACT ("NMHRA"), N.M.S.A. 1978, § 28-1-7

70.    Sutana hereby adopts and incorporates by reference paragraphs 1 through 63 as set forth above.

71.    At the time of the adverse actions complained of, Sutana was qualified to perform the job duties and responsibilities assigned to her.

Exhibit L

72.     Because of her disability, Sutana was subjected to a hostile work environment, retaliation and eventually terminated.

73.     Defendant knew and/or regarded Sutana, at the time of the adverse actions it took, that she had a serious medical disability and was disabled.

74.     Defendant EDD discriminatory actions against Sutana occurred under circumstances raising a reasonable inference that the disability was a determining factor in Defendant's decision to terminate Sutana and subject her to a hostile work environment.

75.     Defendant's adverse actions were in violation of the ADA and the NMHRA by its discharge of her, in that it discharged her because it regarded her as disabled, she was terminated because of a disability and because she reported her disability to the Defendants.

76.     As a direct and proximate result of said intentional and discriminatory conduct, Sutana has lost wages and other benefits; her future earning capacity has been substantially impaired; she has suffered severe emotional distress, humiliation, embarrassment, pain and suffering and loss of enjoyment of life; and she has suffered other non-pecuniary losses, all of which will be proven at the trial of this action.

77.     Defendant's discriminatory conduct exhibited a willful and/or reckless indifference to plaintiff's federally protected right to be free from disability discrimination.

# Exhibit L

78.     Defendant had no legitimate, non-discriminatory business reason for taking adverse action against Sutana.  Any reasons Defendant may put forth are merely pretext for discriminatory and retaliatory acts.

## COUNT II

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

## RETALIATION

79.     Sutana hereby adopts and incorporates by reference paragraphs 1 through 72 as set forth above.

80.     Sutana engaged in protected activity when she sought to enforce her rights and privileges under the ADA.

81.     Adverse employment actions were taken against Sutana by Defendant after Sutana engaged in asserting her federally-protected civil and statutory rights.

82.     A casual connection exists between Sutana's engagement in protected activity and the adverse employment actions complained of.

83.     Defendant had no legitimate, non-discriminatory business reasons for having taken adverse employment actions against Sutana.

84.     Any alleged legitimate, non-discriminatory business reasons which Defendant may put forth are merely pretext for Defendant's retaliatory acts.

85.     As a result of the retaliation Sutana suffered because of engaging in protected activities, she is entitled to damages in an amount to be determined a trial.

# Exhibit L

## COUNT III

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
and
NEW MEXICO HUMAN RIGHTS ACT ("NMHRA"), N.M.S.A. 1978, § 28-1-7**

**HOSTILE WORK ENVIRONMENT**

86.   Sutana hereby adopts and incorporates by reference paragraphs 1 through 79 as set forth above.

87.   Because Sutana applied for and took medical leave she was subject to working onerous work hours, harassing telephone calls, required to respond to EDD e-mails, required to work during her medical leave, asked humiliating and demeaning questions such as "do you eat dogs and monkeys and if she suffered from PTSD because she was from Laos.  Further, Defendant filed specious NCA against Sutana only to dismiss them after she responded.  The hostility Sutana endured altered the rights, privileges and benefits of her employment with the Defendant.

88.   From April 2011 and March 2012, the onerous work load, refusal to provide a promised pay raise, a barrage of four (4) separate NCAs and a NDA, which were all withdrawn, a fraudulent EDD Response, filing the fraudulent EDD Response in her personnel file, as well as racially demeaning comments, created a hostile work environment which became so severe and pervasive that Sutana had to receive medical treatment related to workplace stress.

89.   Defendant knew of this hostile work environment, caused and contributed to it, and permitted this environment to continue over time.

Exhibit L

90.    As a result of the retaliation Sutana suffered in an amount to be determined a trial.

## COUNT IV

## VIOLATIONS OF FAMILY MEDICAL LEAVE ACT

### INTERFERENCE

91.    Sutana hereby adopts and incorporates by reference paragraphs 1 through 84 as set forth above.

92.    At the time that Sutana considered filing her application for medical leave she was discouraged to do so by the Defendant.

93.    On March 25, 2012, when Sutana filed her application for medical leave she was eligible to receive it.

94.    Under Defendant's regulations, Section 1.7.7.12 (F), Sutana could "not accrue annual and sick leave while on unpaid FMLA leave."

95.    The Defendant, EDD, and the Defendants, individually, Barela, Brazil and Jackson, during the period that Sutana was approved for medical leave required her to work, answer telephone calls, respond to e-mails and be available part-time on Tuesdays and Wednesdays.

96.    The Defendant, EDD, and the Defendants, individually, Barela, Brazil and Jackson, decisions and actions related to interfering with Sutana's FMLA entitlement are related to her right to take FMLA leave.

97.    As a result of Defendants' acts and failures to act, Sutana suffered in an amount to be determined a trial.

# Exhibit L

## COUNT V

## VIOLATIONS OF FAMILY MEDICAL LEAVE ACT
## AND TITLE VII, 42 U.S.C. § 1981

## RETALIATION

98.   Sutana hereby adopts and incorporates by reference paragraphs 1 through 91 as set forth above.

99.   Sutana engaged in protected activity under FMLA when she first made known that she desired to access FMLA leave she had accumulated.

100.   Adverse employment actions were taken against Sutana by Defendant, EDD, and the Defendants, individually, Barela, Brazil and Jackson, after Sutana engaged in asserting her federally-protected civil and statutory rights.

101.   A casual connection exists between Sutana's engagement in protected activity and the adverse employment actions complained of.

102.   Defendant, EDD, and the Defendants, individually, Barela, Brazil and Jackson, had no legitimate, non-discriminatory business reasons for having taken adverse employment actions against Sutana.

103.   Any alleged legitimate, non-discriminatory business reasons which the Defendant, EDD, and the Defendants, individually, Barela, Brazil and Jackson, may put forth are merely pretext for Defendants' retaliatory acts.

104.   As a result of the retaliation Sutana suffered because of engaging in protected activities, she is entitled to damages in an amount to be determined a trial.

# Exhibit L

**COUNT VI**

**BREACH OF IMPLIED EMPLOYMENT CONTRACT**

105.   Sutana hereby adopts and incorporates by reference paragraphs 1 through 98 as set forth above.

106. The Defendant compiled and published State Personnel Board employee Rules and Regulations (SPB Rules and Regulations) which EDD employees and Defendants were required to follow and conform to.

107. The SPB Rules and Regulations 1.7.6.13 *et seq.* requires the Defendant to set up a "written complaint procedure" and to "utilize alternative methods of dispute resolution, including mediation … to resolve conflicts …".

108. The SPB Rules and Regulations 1.7.11.8 *et seq.* provide for a method of "progressive discipline" and the utilization of "alternative methods to resolve conflicts …".

109. The SPB Rules and Regulations 1.7.7.12 *et seq.* provides policies and procedures for taking Family Medical Leave and 1.7.7.8 *et seq.* provides policies and procedures for taking annual leave.  Defendant repeatedly and openly violated these policies and procedures.

110. The SPB Rules and Regulations, amongst other things, constitute an implied contract of employment by which the parties through their course of conduct and usage demonstrated their intent to be bound.

111.   Defendants breached the SPB Rules and Regulations in the ways mentioned above, amongst others.  These breaches constitute violations of the implied contract of employment established between the parties.

Exhibit L

112.   Sutana reasonably expected that Defendants would abide by this implied contract.

113.   As a result of these breaches of the implied contract of employment, Sutana is entitled to an award of damages at trial.

## COUNT VII

### VIOLATION OF TITLE VII, 42 U.S.C. § 1981
### DAMAGES UNDER 42 U.S.C. § 1983
### (Individual Defendants)

### DISCRIMINATION BASED ON NATIONAL ORIGIN

114.   Sutana hereby adopts and incorporates by reference paragraphs 1 through 107 as set forth above.

115.   Sutana is a member of a protected class, American-Laotian descent.

116.   Sutana has been employed with the State of New Mexico since July 10, 2006 and was transferred to the Defendant, EDD, in April 14, 2011.

117.   At all times relevant, Sutana was in a contractual relationship with Defendant within the meaning of 42 U.S.C.A. § 1981, as amended.

118.   Defendants had the intent of discriminating against Sutana on the basis of her national origin.

119.   During the course of Sutana's employment since approximately April 14, 2011 through October 5, 2012, Defendants, under color of state law, have violated Sutana's rights by depriving Sutana of her right to the enjoyment of all benefits, privileges, terms and conditions of Sutana's employment



Exhibit L

contract "as is enjoyed by white citizens," in violation of 42 U.S.C.A. § 1981(b), as amended.

120.   During the course of Sutana's employment since approximately April 14, 2011 through October 5, 2012, Sutana has not enjoyed the same benefits, privileges, terms and conditions of employment as have white officers.

121.   Defendants' treatment, practices and policies directed toward Sutana, as more fully described in this complaint, denied Sutana the full and equal benefits of all laws and proceedings for the security of persons and property "as is enjoyed by white citizens," in violation of 42 U.S.C.A. § 1981, as amended.

122.   Defendants' treatment, practices and policies directed toward Sutana, as more fully described in this complaint, denied Sutana the right to make and enforce contracts "as enjoyed by white citizens," in violation of 42 U.S.C.A. § 1981, as amended.

123.   Through their actions and treatment of Sutana, Defendants intended to discriminate against Sutana on the basis of Sutana's race.

124.   Sutana claims damages for the injuries set forth above under 42 U.S.C. §1983 against Defendants, EDD, Barela, Brazil and Wade, for violations of Sutana's constitutional rights under color of law.

125.   These alleged violations were committed by the Defendants, EDD, Barela, Brazil and Wade, as a result of the policies and customs, as well as the policy decisions, made by the Defendants which were deliberately indifferent to the federally protected rights of citizens of the State of New Mexico.

# Exhibit L

## COUNT VIII

### VIOLATION OF 42 U.S.C. § 1983
### and
### FREEDOM OF SPEECH

### (Defendant EDD)

126.   Sutana hereby adopts and incorporates by reference paragraphs 1 through 119 as set forth above.

127.   Prior to October 5, 2012, the Defendants, EDD, developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of employees employed by the State of New Mexico, EDD, which caused the violations of Sutana's rights.

128.   It was the policy and/or custom of the Defendants, EDD, to inadequately and improperly investigate employee's complaints and employee acts of misconduct were instead tolerated by the Defendant, EDD.

129.   The above-described conduct by the Defendant violated the right of Sutana to be free from retaliatory treatment based upon the exercise of her freedom of speech under the First Amendment to the United States Constitution (Art. I, U.S. Constitution).

130.   It was the policy and/or custom of the Defendants, EDD, to negligently hire, inadequately supervise, discipline and train its employee, including Defendants Brazil and Wade, thereby failing to adequately discourage further constitutional violations on the part of its employees.  The Defendant, EDD, did not require appropriate in-service training or re-training of employees who were known to have engaged in employee misconduct.



131.   As a result of the above described policies and customs, employees, including the Defendants Brazil and Wade, believed that their actions would not be properly monitored by supervisors and that misconduct would not be investigated, disciplined or sanctioned, but would be tolerated.

132.   The above described policies and customs demonstrate a deliberate indifference on the part of policymakers of the Defendants EDD to the constitutional rights of persons within the employ of the State of New Mexico, EDD, and were the cause of the violations of Sutana's rights alleged herein.

**COUNT IX**

**RETALIATORY DISCHARGE**

133.   Sutana hereby adopts and incorporates by reference paragraphs 1 through 126 as set forth above.

134.   Defendants discharged Sutana because she reported activities, performed activities and participated in activities that public policy authorizes and encourages – (1) advising her supervisor of an interdepartmental extra martial affair; (2) applying for and taking leave through the use of FMLA and other forms of leave; and (3) filing charges of discrimination with the EEOC.

135.   These mandates of public policy are incorporated into the statutes and the laws of the United States and the State of New Mexico through the ADA, FMLA, NMHRA and Title VII, respectively.

136.   The termination of Sutana was effected for the purpose of ridding Defendant EDD of an employee who sought to assert her statutory rights and brought to Defendants' attention that the work load was that of a $148.3

Exhibit L

million dollar budget not $6.8 million, she had not received a promised pay raise, that she was eligible for medical leave under FMLA which was interfered with, she filed EEOC charges of discrimination, and otherwise advised Defendants that their actions were unlawful.

137.  If not for the retaliatory purpose underlying the termination of Sutana, the termination would not have occurred.

138.  None of the pretexted acts, later claimed by the Defendants to justified Sutana's termination, were in accordance with Defendant's SPB Rules and Regulations regarding progressive disciplinary and alternative dispute methods of resolving employee issues prior to Sutana raising the issues.

## COUNT X

## FIRST AMENDMENT FREE SPEECH

139.  Sutana hereby adopts and incorporates by reference paragraphs 1 through 132 as set forth above.

140.  Defendants while acting "under color" of state law, intentionally deprived Sutana of her rights under the First Amendment of the U.S. Constitution.

141.  Sutana exercised her rights of freedom of speech guaranteed by the First Amendment to the United States Constitution when she submitted her September 2, 2011, e-mail to the Defendants. Defendants engaged in conduct that was intended to infringe upon Sutana's constitutionally protected interest in freedom of expression.



142.   Defendants' conduct includes, but is not limited to, turning Sutana's e-mail into a "formal complaint", fabricating the EDD's response with false and inaccurate information, issue numerous NCA's, and terminating Sutana's employment.

143.   Sutana's e-mail or speech was "protected activity" under the First Amendment. Sutana's e-mail or speech was a motivating factor for the Defendants' decision to discipline her, impair her employment and terminate her employment.

## COUNT XI

### VIOLATION OF THE WHISTLEBLOWR PROTECTION ACT

144.   Finance Manager for New Mexico Economic Development Department ("EDD"), Sutana was responsible for preparing, amongst other things, EDD's budget, budget requests and operating budget.  This included knowledge and understanding about the NMITC, the SHARE system and the procurement code for the State of New Mexico.  Sutana was responsible for helping the CFO, Saenz, make sure EDD operated in a fiscally prudent, proper and responsible manner.

145.   Defendants, Barela, Brazil and Jackson, however, were more concerned about firing employees, securing tax credits for a company they had either ownership interest in (Barela) or had invested in (Brazil) and taking control of the procurement process by signing purchasing agreements (Jackson) and avoiding statutory responsibilities to enforce the State



Procurement Code, the NMITC program, and the State Personnel Board's Rules and Regulations.

146.  As a result, Sutana was often the target of the vengeance of Defendants, Barela, Brazil and Jackson, because she blew the whistle on the procurement code violations and the improper activities occurring in the NMITC program.

147.  Sutana, on several occasions, raised concerns about procurement code violations and contracts not being signed by the CFO nor was a Memorandum produced by the CFO for certain contracts, she was told by Saenz that Defendant, Brazil, did not want EDD to use the term "Procurement Code Violations". Defendants, Barela, Brazil and Jackson, met those concerns with deaf ears.

148.  In addition to raising concerns about procurement code violations, Sutana raised concerns, prior to her termination, about a company, CEREA link a company founded by Defendant, Barela, and invested in by Defendant, Brazil, and possible improper investment tax credits being processed through EDD.  Defendants, Barela, Brazil and Jackson, met those concerns with deaf ears.

149.  Unable to cure these unlawful and improper acts internally, in late June or early July 2012, Sutana reached out to the New Mexico Attorney General's Office by e-mail for assistance and halting some of the practices that Sutana reasonably and in good faith believed constituted unlawful and/or

# Exhibit L

improper acts.  A true and correct copy of the letter of acknowledgment from the Attorney General's Office is attached hereto as Exhibit A.

150.  In October 2012, Sutana's employment was terminated for allegedly being incompetent and/or insubordinate.  Defendants provided no legitimate reason or non-retaliatory reason for Sutana's termination.

151.  Upon information and belief, Defendants, Barela, Brazil and Jackson, orchestrated Sutana's termination in retaliation for Sutana's (a) internal complaints about procurement code violations which constitute violations of New Mexico law, malfeasance, waste and abuse of authority; (b) communications to the Attorney General seeking assistance to enforce the state procurement code and halt the practices that Sutana reasonably and in good faith believed constituted unlawful and/or improper acts; and (c) communicating to Brent Eastwood and Saenz that she reasonably and in good faith believed that CERE link, a company owned by the Defendant, Barela, and invested in by Defendant, Brazil, was improperly seeking tax credits through the EDD.

152.  Defendants, EDD, Barela, Brazil and Jackson, qualify as "public employer" under the New Mexico Whistleblower Act ("WPA"), N.M.S.A. 1978, § 10-16C-2(1) and (4).

153.  Sutana qualifies as a "public employee" under the WPA, N.M.S.A. 1978, § 10-16C-2(B).

154.  Sutana's internal complaints and communications to Brent Eastwood, Saenz, Defendants, Barela, Brazil and Jackson and others about



Exhibit L

violations of New Mexico law, malfeasance, waste and abuse of authority constituted good faith disclosures of unlawful or improper acts by the Defendants, EDD, Barela, Brazil and Jackson within the meaning of the WPA.

155.   Sutana's late June or early July e-mail to the Attorney General and Defendants, constituted good faith disclosures of unlawful or improper acts by the Defendants, EDD, Barela, Brazil and Jackson within the meaning of the WPA.

156.   Upon information and belief, Defendants, EDD, Barela, Brazil and Jackson, terminated Sutana in October 2012 in retaliation for Sutana's protected activities under the WPA.

157.   By doing so, Defendants violated the WPA.

158.   As a result of Defendants' violations of the WPA, Sutana has suffered actual damages in the form of lost past wages and future wages, and special damages.

159.   Sutana, therefore, is entitled to actual damages, reinstatement with the same seniority status that she would have had but for the violation, two times the amount of back pay with interest, special damages, litigation costs and reasonable attorney's fes pursuant to the WPA, N.M.S.A. 1978, § 10-16C-4(A).

## COUNT XII

## VIOLATION OF THE FRAUD AGAINST TAXPAYERS ACT

160.   Sutana's internal complaints and communications to Defendants, EDD, Barela, Brazil and Jackson and others about violations of New Mexico



law, malfeasance, waste and abuse of authority and her June or July e-mail to the Attorney General and Defendants were lawful acts in disclosing information to a government or law enforcement agency within the meaning of the Fraud Against Taxpayers Act ("FATA"), NMSA 1978, § 44-9-11(B).

161.   Defendants' termination of Sutana was, upon information and belief, retaliation for Sutana's internal complaints and communications to Defendants and others about violations of New Mexico law malfeasance, waste and abuse of authority and e-mails to the Attorney General and Defendants.

162.   Defendants, therefore, violated the FATA.

163.   Upon information and belief, Defendants retaliation was willful, wonton, arid/or in reckless disregard for Sutana's rights.

164.   As a result of Defendants' violation of the FATA, Sutana has suffered actual damages in the form of lost past and future wages and special damages.

165.   Sutana therefore, is entitled to actual damages, reinstatement, two times the amount of back pay with interest, special damages, punitive damages, and reasonable attorney's fees pursuant the FATA, NMSA 1978, § 44-9-11 (C).

**DAMAGES**

**WHEREFORE**, Sutana respectfully requests this Court grant her judgment in her favor, including:

1. Two times the amount of past lost wages and benefits with interest;

2. Future lost wages and benefits;



3. Mental, emotional, and psychological distress;

4. <u>Special Damages</u>;

5. Pre-judgment and post-judgment interest;

6. Punitive or exemplary <u>damages under FATA, N.M.S.A. 1978, § 44-9-11 (C) or any other rule or statute;</u> and

7. Award of attorney fees and costs allowable under statute and rule.

**RESPECTFULLY SUBMITTED:**

By:    <u>/s/ Nathaniel V. Thompkins</u>
        Nathaniel V. Thompkins
        103 St. Francis Drive, Unit A
        Santa Fe, NM 87501
        505-988-9750
        Fax: (866) 657-8780
        Email: nate@newmexicofirm.com
        *Attorney for Plaintiff*

# Exhibit L