IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DANNI SUTANA,

    Plaintiff,

v.                                                              Case No. 13cv00210 JCH/LAM

STATE OF NEW MEXICO, ECONOMIC DEVELOPMENT DEPARTMENT;
JONATHAN ("JON") BARELA, individually and in his official capacity;
BARBARA G. BRAZIL, individually and in her official capacity;
WADE JACKSON, individually and in his official capacity;

    Defendants.

**PLAINTIFF'S REPLY TO NEW MEXICO LLC'S RESPONSE TO
PLAINTIFF'S MOTION TO RELEASE LIEN, OR, ALTERNATIVELY,
MOTION TO REDUCE AMOUNT OF LIEN**

**COMES NOW** Plaintiff Danni Sutana [hereinafter "Sutana"], by and through her counsel of record, Law Offices of Michael E. Mozes, P.C., and hereby submits her Reply to New Mexico Firm [hereinafter "NMF"] LLC's Response to Plaintiff's Motion to Release Lien, or, Alternatively, Motion to Reduce Amount of Lien. As grounds therefor, Sutana states as follows:

**I.  INTRODUCTION**

Sutana is well-within her rights to challenge the charging lien filed by Thompkins on behalf of NMF. This is particularly so in light of the misstatements of fact and law that litter Thompkins' Response. Thompkins position in the Response–that Sutana agreed to Thompkins' receiving the entire SPO settlement amount of $50,000 in payment of "partial fees"–is contradicted by the contemporary and subsequent settlement documentary evidence, Sutana's refusal to have Thompkins continue as her counsel, and the circumstances under which Thompkins retained the entire settlement amount.

During the course of the settlement conference in this matter, presided over by the

Honorable Lourdes A. Martinez, Thompkins represented via telephone, with Judge Martinez, Sutana, and Mozes able to overhear the conversation, that he had filed a charging lien to protect his fees in this matter and that the lien had been served on Sutana. Both representations were false. *See generally Docket Sheet.* In the absence of the lien and in the presence of Thompkins' billing records and the documents related thereto, it is of no surprise nor moment that Sutana would now dispute the fee billings in this matter–which are inextricably linked to the work Thompkins performed in the SPO administrative matter.

Thompkins states that "the only overlap" between the administrative and federal matters implicated the "just cause" of Sutana's termination. *Resp. Brf., p. 2.* Thompkins then ties that "overlap" into a claim that a "just cause" finding in the administrative matter would lead to dismissal of the Title VII and NMHRA claims. *Id.* Of course, Thompkins' position is contradicted by precedent that accords no collateral estoppel nor preclusive value to any administrative "just cause" finding, especially where discrimination and/or retaliation claims are neither litigated nor decided by the administrative judge. *See e.g., Cordova v. New Mexico Taxation & Revenue, 2011 U.S. Dist. LEXIS 152878 (D.N.M. 2011), discussed more fully below.*

There is perhaps no more stark misrepresentation in Thompkins' Response Brief than "[T]he factual allegations . . . in the SPO case were entirely different than the facts . . . in Plaintiff's claims in her Complaint and Amended Complaints in the federal court." A simple review of the Complaint and the Amended Complaints filed by Thompkins, along with the SPO Stipulated Pre-Hearing Order (SPHO), *Thompkins Exh. K*, show the following:

1. Original Complaint (*Thompkins' Exh. A*): Paragraphs 18, 19, 20, 21, 23, 25, 27, 28, 29, 32, 33, 36, 46, 52, and 53 accord with paragraphs 1-17 of the SPHO.

2. First Amended Complaint, *Attached hereto as Exhibit 1*: The only change from the Original Complaint is Thompkins deleted the sentence in paragraph 51, "As a result, Sutana was forced to take medical leave." Thompkins billed Sutana 1.3 hours for what literally took less than 10 seconds to accomplish. Allegations

       same as no. 1 above.

   3.     Third Amended Complaint: *Doc. 10.* Essentially the same allegations as the First Amended Complaint, with the addition of 6 paragraphs related to the claims under the Whistleblower Protection Act (WPA) and Fraud Against Taxpayers Act (FATA). Thompkins billed the work on this amended complaint at 6.4 hours.

Eventually, when all the billable hours are added up for the filings of complaints pertinent to this action, Thompkins billed Sutana 34.6 hours for a Complaint and its various amendments (some cosmetic in nature) that wholly relied upon work already accomplished through the administrative process.

     No evidence supports the bald-faced claim that the first engagement letter of September 11, 2012, *Pltf's Exh. 1*, controlled the federal litigation because Sutana requested that it be so. It was, of course, Thompkins' prerogative to utilize whatever fee agreement he deemed acceptable under the circumstances. The reference to Sutana's psychological condition is insulting, demeaning, and uncouth. To the extent that Thompkins implies that Sutana simply did not know what she is doing because of her disability or did not comply with Thompkins' counsel, the implication is without any record support. The sad truth of this matter is that Sutana followed Thompkins' advice even to her great detriment and prejudice–eventually being excluded from any monetary recovery on any of her claims through Thompkins' SPO representation.

## II. DISPUTES RELATED TO THOMPKINS' FACTUAL ALLEGATIONS

   1.     No evidence whatsoever supports the following allegations of Paragraph 1: (1) Sutana requested a Right to Sue letter; (2) Thompkins represented Sutana before the EEOC; (3) Sutana wanted to pay the SPO case on an hourly retainer; and (4) Sutana requested a hybrid fee agreement on the court litigation. These are simply claims without substance.

   2.     With respect to paragraph 3, the facts are the stay was not lifted in the federal court until July 10, 2014. *Doc. 30.* In addition, nothing in Thompkins' Exhibit G discusses a lifting of the stay. The best that can be said about the purpose of the conference with Judge Scott

is that Thompkins wanted to "discuss the matter regarding a stay . . . " *Thompkins' Exh. G*.

Further, nothing in Thompkins' Exhibit F states that Sutana either wanted the court case handled under a "hybrid contingency fee agreement" or that she did not want the SPO case handled under a "hybrid contingency fee agreement." These are mere inventions. Exhibit F does state the following: (1) Sutana wanted no more "surprises" from Thompkins related to money; (2) Sutana agreed to Thompkins receiving his fee out of any verdict/settlement; (3) Sutana requested the terms and conditions of fee payments and what the contingency percentage would be; (4) Sutana requested monthly billing statements; and (5) Sutana could not understand why *Thompkins* wanted her claims handled under two separate contracts. *Thompkins' Exh. F*. (emphasis added). Exhibit F directly contradicts Thompkins' representations regarding of how attorney's fees would be paid. Thompkins never provided the information Sutana requested.

3. Paragraph 3 is similar to the representations of paragraph 2–Thompkins blaming Sutana for the form of fee agreement he entered into with Sutana. Besides the utter foolishness of such a representation, nothing supports that Sutana wanted "the SPO case handled on an hourly fee agreement." *See Exh. F*. Sutana was confused by the need for two fee agreements. *Id*. Exhibit H merely exemplifies the confusion Sutana had throughout her dealings with Thompkins–instead of agreeing the arrangements were acceptable, Sutana actually continued to question the billings and stated that she should have had the invoice sooner because she could not afford Thompkins' representation. *See Thompkins' Exh. H*.

5. Contrary to Thompkins' representation in Paragraph 4, the representation in Sutana's Exhibit 3, *Doc. 114-3*, states "As *we* have mentioned before both the SPO and the federal law suit are related and go hand in hand." The only "we" in Thompkins' offices are he and his wife Bina. This representation included Thompkins. Further, Thompkins' Exhibits F, G, and H all demonstrate that Thompkins' offices treated the cases as inextricably related.

The ever-present claim of Thompkins that the SPO case would adversely affect the

federal suit is contradicted by case law. Judge Browning's rulings in *Cordova v. N.M. Taxation & Revenue Dep't, 2011 U.S. Dist. LEXIS 152878 (D.N.M. 2011)* are dispositive of the question. Decisions of administrative bodies have no collateral estoppel or preclusive effect where the issues have no opportunity to be fully litigated. *Id. at *45, citing Shovelin v. Cent. N.M. Elecl. Coop., Inc., 11t5 N.M. 283, 298 (1993)*. In *Cordova*, "just cause" determinations had no effect on plaintiff's discrimination and retaliation claims because the administrative proceedings did not include the litigation of those matters. The same is true here.

However, Thompkins' representations that the two cases, SPO and federal lawsuit, were interdependent permitted him to maintain the Sutana representations under the guise of two different fee agreements–for which he was able to bill Sutana hourly throughout without adherence to a contingency on claims that did have significant overlap with respect to the SPO factual foundations. *See e.g. Sutana's Exh. 13*.

6.     However much Thompkins may protest the fact allegations of paragraph 6 of the Motion to Release Lien, every factual representation made is rooted in the evidence. Thompkins expends pages in the Response attempting to explain the complexity of what is obviously a straightforward "just cause" dispute. *Resp., pp. 7-11*. However, Sutana's claims had nothing to do with document review nor issue complexity, but, rather, the appropriateness of the billing records, which, for example, indicated the time Thompkins allegedly spent ***attending*** the depositions. The records show that the Barela deposition occurred at 9:07 a.m. on the date of deposition. The billing records for the Brazil depositions simply state "Deposition of Brazil." *Sutana's Exh. 4*. Thompkins claims that he invested significant "prep time" on these dates is belied by the timing of the depositions.

The issue is that the records were clearly manipulated to exaggerate time spent attending the depositions. The time when the depositions began and ended contradict any claim that "preparation for deposition" took place on the dates noted. These sort of issues pepper the

billing records.

6.     Paragraph 9's claims are without support.  Exhibit C provides no support for the claim that Sutana requested that the SPO and litigation matters be separately handled and billed.  Indeed, the evidence in this matter shows Sutana *could not understand why the matters were being billed out in that fashion.  Thompkins' Exh. F*.  This is the fallacy that underlies the entirety of Thompkins' arguments–that Sutana forced Thompkins into a fee agreement arrangement he neither wanted nor contemplated.  No evidence supports that claim and the only evidence is contrary to it.

Thompkins has no evidence to support the broad claims in Paragraph 9 that "she [Sutana] changed her mind about the Firm collecting its fees at the conclusion of the Federal case" or that Sutana did anything other than follow Thompkins' counsel regarding the resolution of the SPO case.  *See Thompkins Exhs. S and T*.

More importantly, Thompkins flat out misrepresents to the Court that the Settlement was not finalized prior to May 31, 2014.  *Resp., p. 13*.  Documentation shows that the State had invoiced and approved the settlement amount of $50,000 on May 21, 2014.  *Sutana's Exhibit 2, Payment Docs*.  In light of these facts, Thompkins was merely misrepresenting the status of the SPO matter on May 31, 2014 when he wrote Sutana.  *Thompkins Exhibit T*.  The only concern of Thompkins on May 31st was to get Sutana to agree to a settlement he had brokered without her participation.  *Id*.  The subsequent June 14, 2014 conversation with Sutana and her fiancee were additional steps in the farce Thompkins perpetrated.  Indeed, the check issued by the State shows that it was cut on May 22, 2014–long before the conversations Thompkins now claims demonstrate Sutana's agreement with the settlement.  *See Sutana's Exh. 12*.

The most telling email related to settlement decisions is Sutana's Exhibit 11.  The first email, dated June 14, 2014 (Sutana reminds the Court that the settlement check had been cut more than three weeks earlier) from Sutana's fiancee to Thompkins, states settlement points.

6

Thompkins responded on June 15th that "[T]he balance of our attorney's fees will come out of the federal lawsuit or award." Based upon Thompkins' billing records, *Sutana's Exh. 5, last page*, that balance was $57,570.92. The stated agreement between the parties was that Thompkins would be paid this amount out of any verdict or settlement in the federal case. *Sutana's Exh. 3*. On January 10, 2014, Thompkins' offices specifically stated to Sutana, "We are not going to charge you for the SPO until we have a settlement for you in the Federal Case . . ." *Id*. This representation was never contradicted prior to settlement of the SPO case.

7. Paragraph 10 contains nothing more than unsubstantiated, misleading, and inaccurate statements about the distribution of the settlement proceeds. Notably, not a single fact representation in Paragraph 10 alludes to any corroborating evidence. There is none. Thompkins falsely states to the Court that Sutana was "provided a copy of the Settlement check" in the face of the documentary evidence that Thompkins refused to send her a copy and Sutana had to prevail upon the State in order to get a copy. *Sutana's Exhibit 12*.

8. With respect to Paragraph 16, Thompkins ***never*** received discovery from Defendants in the federal case, contrary to his representation. *Resp., p. 18*. No written discovery was sent out by Thompkins nor depositions taken. If Thompkins does not know what pre-discovery matters are in the context of a federal litigation, then it is unsurprising that he is also confused by Sutana's representations that the federal case billings represent a gross, over-inflated billing exercise.

The fact is, as shown through Thompkins' Exhibits V, LL, and MM, that the only assistance actually provided by Thompkins to Mozes in the course of the federal litigation is whether Kurt Saenz would sign off on an affidavit. The affidavit was neither presented for signature nor ever sent to Mozes. Mozes has no idea what Thompkins is referencing with respect to seeking Thompkins counsel on formulating a settlement demand in the federal case.

9. With respect to Paragraph 18, Sutana did not have opportunity to reject the fee

7

reduction to $15,000, as Thompkins claims.  When Sutana requested additional time to appropriately respond to that offer, Thompkins denied such and the offer lapsed.  *Emails Between Mozes and Thompkins, attached hereto as Exhibit 3.*

With respect to the additional disputes and disagreements raised by Thompkins on the facts raised through the Motion to Release, the Motion itself, principally, addresses those disputes.  To the extent the Motion does not address any issue set forth by the allegations in the Response, Sutana will address those matters at a hearing before the Court.

### III.  ARGUMENTS AND AUTHORITIES

A.  The Fees Charged And The Hybrid Fee Agreement Violate NMRA 16-105(A) And ( C ).

With respect to whether the fees charged in this matter are reasonable, those arguments are fully set forth by Sutana in Sections I and II(B)(2) and (3) of Sutana's opening brief.  Other than make conclusory, self-interested arguments regarding the complexity of claims that Thompkins presented to the Court through a series of amended complaints, Thompkins cannot dispute the fact that he took no discovery in the federal case.  Sutana's claims of unreasonableness related to the fees charged by Thompkins have little to nothing to do with the complexity of the claims.   The issues Sutana presses are (1) Thompkins over-billed Sutana on time actually dedicated to various entries on the billing records and (2) duplicated fees charged in the SPO matter for tasks and actions taken in the federal case.  Thompkins' arguments related to matters outside these two issues are, simply put, misplaced.

On Sutana's position that the hybrid fee-agreement violates Rule 16-105 ( C ) on its face, Thompkins avoids Sutana's arguments.  Thompkins confuses the matter of what his hourly billing rate was and the requirement5
s of Rule 16-105 ( C ) on what must be included in contingency fee agreements.  The fee

agreement at issue nowhere states to what extent a contingency would be applied to any recovery, the percentage of such contingency, and the method by which the contingency is to be determined.  Simply stating that the fee agreement sets out an hourly rate does not begin to address the contingency fee agreement requirements.  This is particularly troubling because Sutana expressed her confusion on the necessity of the hybrid fee agreement and how fees were to be calculated.  It cannot be that an attorney manufactures a hybrid agreement such as at issue here to charge a $10,000 retainer "to cover the initial amount of attorney's fees anc costs" and then turn around and claim that a contingency underlies payment of fees. *Sutana's Exh. 1, ¶¶ 3 and 5*.  Based on Thompkins' Exhibit I, it is apparent that costs for the federal suit, in spite of Sutana's $10,000 retainer, continued to be billed.  It appears all $10,000 went for payment of fees.  This is unsurprising in light of the fact the fee agreement nowhere explains the details of the contingency/hourly arrangement.

Summing up, this fee agreement clearly and openly violates Rule 16-105.  It is invalid and unenforceable.

### B.     The Charging Lien Remains Unenforceable.

Thompkins argument on the enforceability of the lien illustrates the problem with the fee agreement–Thompkins stubbornly refers to the fee agreement as an "hourly" arrangement, completely ignoring the "contingency" aspect of the agreement.  In every attorney-client fee agreement–whether hourly, contingency, or any so-called hybrid arrangement–there inherently exists unpredictability of "maximum fees and costs."  Merely stating that such is true has no bearing whatsoever on the nature of the agreement itself.  In this matter, Thompkins held out to Sutana that there was a contingency aspect in the fee agreement, although undefined and violative of the Rules of Professional Conduct.

For Thompkins to now come to the Court and argue that, because the hybrid agreement he composed references an hourly fee, it is somehow valid or need not produce "tangible fruits"

9

in order to recover fees represents the height of disingenuity.  Thompkins' attempts to write out the contingency aspect of the agreement he wrote is disconcerting.  The undeniable fact remains that Thompkins recovered nothing for Sutana through his representation in the federal suit. On one hand Thompkins states that the hourly fee reference in the fee agreement allows him a recovery of all his fees and, on the other hand, equitable principles should be applied to his lien because of the contingency arrangement.  This is not only contrary to New Mexico law, it is outright dishonest.

## IV.  CONCLUSION

In light of the foregoing arguments and facts, Sutana respectfully requests that this Court grant her Motion to Release Lien, or, Alternatively, Motion to Reduce Amount of Lien in the measure the Court deems just and appropriate under the circumstances.

Respectfully submitted,

LAW OFFICES OF MICHAEL E. MOZES, P.C.

*/s/ Michael E. Mozes*
MICHAEL E. MOZES
5732 Osuna Rd. NE
Albuquerque, NM 87109-2527
(505) 880-1200
(505) 881-2444 (fax)
Michael@mozeslawoffice.com

**I HEREBY CERTIFY** a copy of the foregoing pleading was served upon opposing counsel of record, Christopher T. Saucedo and Frank Apodaca, Esq., via e-mail and through filing with the Court's electronic CM/ECF filing system on this 13th day of July, 2015.

*/s/ Michael E. Mozes*
Michael E. Mozes